UNITED STATES of America, Plaintiff,

v.

AN ANTIQUE PLATTER OF GOLD, KNOWN AS A GOLD PHIALE ME- SOMPHALOS, C. 400 B.C., Defendant- in-rem.

Michael H. Steinhardt, Claimant.

Republic of Italy, Claimant.

No. 95 Civ. 10537(BSJ).

United States District Court, S.D. New York.

Nov. 14, 1997.

**224**

Mary Jo White, U.S. Attorney for the Southern District of New York (Evan T. Barr, Assistant U.S. Attorney), for U.S.

Schulte Roth & Zabel by Michael S. Feldberg, New York City, for claimant Michael H. Steinhardt.

### MEMORANDUM & ORDER

JONES, District Judge.

This case involves the forfeiture of an antique gold platter known as a phiale mesomphalos (the "Phiale"). Pending are claimant Michael H. Steinhardt's and plaintiff United States of America's cross motions for summary judgment. For the reasons stated below, summary judgement is granted to the United States.

### FACTS[1]

The defendant-in-rem is a 4th Century B.C. antique gold platter of Sicilian origin. Its circuitous path to the United States began sometime around 1980, and culminated in the current forfeiture action.

In 1980, Vincenzo Pappalardo, a private antique collector living in Catania, Sicily in Italy approached Dr. Giacomo Manganaro, a professor of Greek history and Numismatics, for an expert opinion regarding the authenticity of the Phiale, which was in Pappalardo's collection at the time. The Phiale had an inscription along its edge, written in a Greek Doric dialect that had been spoken in the ancient Greek–Sicilian colonies. Based on that inscription and his own study, Dr. Manganaro concluded that the Phiale was authentic and of Sicilian origin.[2]

Later in 1980, Pappalardo traded the Phiale to Vincenzo Cammarata, a Sicilian coin dealer and art collector, for art works valued at about 30 million Italian lire (approximately $20,000).[3]

In 1991, Cammarata showed the Phiale and a gold-plated silver cup to Silvana Verga, an employee of the Monuments and Fine Arts Bureau in Palermo, Sicily, and to Enzo Brai, an Italian photographer. Cammarata told Verga and Brai that the Phiale and silver cup had been found near Caltavuturo, Sicily during the completion of some electrical work by an Italian utility company.[4]

Cammarata also gave a photograph of the Phiale to William Veres, an art dealer and

---

1. The following facts are from the parties' Statements Pursuant to Local Rule 3(g), and from their affidavits and exhibits. All facts presented, unless otherwise noted, are admitted or uncontroverted by the parties.

    For clarity of reading, cites to the record are in footnotes.

2. Report of Information for Testimonial Evidence of Giacomo Manganaro (hereinafter "Manganaro Report") at 1–3; Government Statement Pursuant to Rule 3(g)(hereinafter "Government Statement") at ¶¶ 1, 2; Steinhardt Statement in Opposition to Plaintiff's Statement Pursuant to Rule 3(g)(hereinafter "Steinhardt

Response") at ¶¶ 1, 2 (no information as to these facts).

3. Transcript of Interrogatory of Person Under Investigation of Vincenzo Cammarata (hereinafter "Cammarata Transcript") at 2–3; Government Statement at ¶ 3; Steinhardt Response at ¶ 3 (no information as to these facts).

4. Transcript of Interrogatory of Person Under Investigation of Silvana Verga (hereinafter "Verga Transcript") at 3; Government Statement at ¶¶ 4–6; Cammarata Transcript at 3–4; Steinhardt Response at ¶¶ 4–6 (no information as to these facts).

personal friend who owned an art dealership company named Stedron based in Zurich, Switzerland. Veres, a specialist in antiquities, became interested in acquiring the Phiale despite some doubts as to its authenticity, and later acquired the Phiale from Cammarata in exchange for objects worth about 140 million lire (approximately $90,000).[5]

Veres brought the Phiale to the attention of Robert Haber,[6] an American art dealer and owner of Robert Haber & Company Ancient Art in New York City.[7] In November, 1991, Haber traveled to Sicily to meet Veres and to see the Phiale in person.[8]

Haber became interested in the Phiale and believed that claimant Michael Steinhardt, a client of his, might be interested in acquiring it.[9] Haber had previously sold Steinhardt 20 to 30 objects, totaling $4 million to $6 million in sales.[10] Haber told Steinhardt that the Phiale was the twin of one belonging to the Metropolitan Museum of Art in New York City, and that its seller was a Sicilian coin dealer.[11]

Thereafter, Steinhardt, with Haber as an intermediary, agreed to purchase the Phiale. Under the final terms of the agreement, as incorporated in a telefax dated December 4, 1991, Steinhardt agreed to pay 1.3 billion lire (over $1 million) in two equal wire transfer installments plus a 15% commission fee for the Phiale. In total, Steinhardt agreed to pay approximately $1.2 million to acquire the Phiale, the first installment of which would be wired to Credit Suisse, New York in favor of Veres' Stedron account at Bank Leu in Zurich, Switzerland.[12]

In addition, a one page document entitled "Terms of Sale" and signed by Veres provided that "[i]f the object is confiscated or impounded by customs agents or a claim is made by any country or governmental agency whatsoever, full compensation will be made immediately to the purchaser."[13] The Terms of Sale further provided that "[a] letter is to be written by Dr. Manganaro that he saw the object 15 years ago in Switz."[14]

On December 6, 1991, Steinhardt wired the first money transfer installment from his account in New York to Veres' Stedron account.[15]

On December 10, 1991, Haber flew from New York to Zurich. From there he traveled across the Swiss Alps to Lugano, Switzerland, a town near the Swiss–Italian border that is about a three-hour car drive from

---

5. Cammarata Transcript at 3–4; Government Statement at ¶¶ 7, 9, 17; Steinhardt Response at ¶¶ 7, 9, 17 (no information as to these facts).

6. At a February 1, 1996 deposition, subsequent to the Government's seizure of the Phiale and the commencement of the current action, Haber invoked the Fifth Amendment and refused to answer any questions regarding the purchase and importation of the Phiale. *See* Deposition of Robert Haber (hereinafter "Haber Deposition").

7. Government Statement at ¶ 8; Steinhardt's Response at ¶ 8 (no information as to this fact).

8. Travel Itinerary for Robert Haber, submitted as Government Exhibit 4; Government Statement at ¶ 10; Steinhardt's Response at ¶ 10 (admitting this fact).

9. Government Statement at ¶ 11; Steinhardt's Response at ¶ 11 (admitting this fact).

10. Steinhardt Deposition at 35–36.

11. Government Statement at ¶¶ 12, 13; Steinhardt Response at ¶¶ 12, 13 (admitting this fact).

12. December 4, 1991, Telefax from Laura Siegel, submitted as Government Exhibit 6; Government Statement at ¶¶ 19–23; Steinhardt Response at ¶¶ 19–23 (admitting these facts).

13. Terms of Sale for the Phiale, submitted as Government Exhibit 5, at ¶ 6; Government Statement at ¶ 18; Steinhardt Response at ¶ 18 (admitting this fact).

14. Government Exhibit 5 at ¶ 3; Government Statement at ¶ 18; Steinhardt Response at ¶ 18 (admitting this fact).

   The portion of the clause involving Dr. Manganaro's letter had been added by hand by Haber. The original typed language read, "[a] letter is to be written by Dr. Manganaro which is an unconditional guarantee of the authenticity and Swiss origins of the object." Government Exhibit 5 at ¶ 3.

   Dr. Manganaro claims that he never agreed to certify that the Phiale was authentic, that it was of Swiss origin, or that he had seen it in Switzerland. Manganaro Report at 4.

15. December 6, 1991 Wire Transfer from Steinhardt to Stedron, submitted as Government Ex-

Zurich.[16] On or about December 12, 1991, Haber took possession of the Phiale from Veres.[17] The transfer was confirmed in a commercial invoice signed by Veres and issued by Stedron, describing the object as "ONE GOLD BOWL—CLASSICAL ... DATE—C. 450 B.C. ... VALUE U.S. $250,000." [18]

On December 13, 1991, Haber sent a two-page fax to Larry Baker at Jet Air Service, Inc. ("Jet Air"), Haber's customs broker at J.F.K. International Airport in New York. The fax included information about Haber's return flight and a copy of the commercial invoice for the Phiale.[19]

Jet Air, in turn, prepared two Customs forms (collectively the "Customs forms"). First, Jet Air prepared an Entry and Immediate Delivery form (Customs Form 3461) to obtain release of the Phiale by a Customs inspection team prior to formal entry. This form listed the Phiale's country of origin as "CH," the code for Switzerland. Second, Jet Air prepared an Entry Summary form (Customs Form 7501), which also listed the Phiale's country of origin as "CH." In addition, this form listed the Phiale's value at $250,000, despite the fact that it had just been sold for over $1 million. The form made no mention of the Phiale's Sicilian origin or of its Italian history. Haber was listed as the importer of record.[20]

On or about December 14, 1991, Haber returned from Lugano to Zurich.[21] On December 15, 1991, Haber flew from Geneva to J.F.K. International Airport in New York carrying the Phiale. From there, he entered the United States with the Phiale.[22]

On January 6, 1992, Haber or Steinhardt consigned the Phiale to the Metropolitan Museum of Art to determine its authenticity. The museum declared the Phiale authentic and returned it to Haber or Steinhardt on January 24, 1992.[23]

On January 29, 1992, Steinhardt wired the second installment from his New York account to the Stedron account. On March 11, 1992, Steinhardt wired Haber's commission of $162,364 to the Stedron account. The commission price had been determined by taking 15% of the purchase price in lire and converting the amount to dollars.[24]

From 1992 to 1995, Steinhardt possessed the Phiale and displayed it in his home.

### PROCEDURAL HISTORY

On February 16, 1995, the Italian Government submitted a Letters Rogatory Request to the United States pursuant to the Treaty on Mutual Legal Assistance in Criminal Matters seeking assistance in (1) investigating the circumstances surrounding the exportation from Italy of the Phiale and its subsequent importation into the United States,

hibit 14; Government Statement at ¶ 24; Steinhardt Response at ¶ 24 (admitting this fact).

16. Government Exhibits 4; Haber's American Express Card account statements, submitted as Government Exhibit 7; Government Statement at ¶¶ 25–26; Steinhardt Response at ¶¶ 25–26 (no information as to these facts).

17. December 12, 1991, Commercial Invoice from Stedron, submitted as Government Exhibit 8; Government Statement at ¶ 27; Steinhardt Response at ¶ 27 (admitting this fact).

18. Government Exhibit 8; Government Statement at ¶ 27; Steinhardt Response at ¶ 27 (admitting this fact).

19. Government Statement at ¶¶ 31, 32; Steinhardt Response at ¶¶ 31, 32 (admitting these facts).

20. Customs Forms 7501 and 3461, submitted as Government Exhibit 10; Government Statement

at ¶¶ 33, 34, 37, 38; Steinhardt Response at ¶¶ 33, 34, 37, 38 (admitting these facts).

21. Haber's American Express Card account statements indicate that he stayed in a hotel in Lugano on the nights of December 12 and December 13, 1991. *See* Government Exhibit 7.

22. Government Statement at ¶ 36; Steinhardt Response at ¶ 36 (admitting these facts).

23. Metropolitan Museum of Art Records Regarding Examination of Gold Phiale, submitted as Government Exhibit 11; Government Statement at ¶¶ 39–41; Steinhardt Response at ¶¶ 39–41 (admitting these facts).

24. March 6, 1992 Fax from Haber to Steinhardt, submitted as Government Exhibit 12; March 11, 1992 Wire Transfer from Steinhardt to Stedron, submitted as Government Exhibit 13; Government Statement at ¶¶ 44, 45; Steinhardt Response at ¶¶ 44, 45 (admitting these facts).

and (2) confiscating the Phiale so that it could be returned to Italy.

On November 9, 1995, agents of the United States Customs Service, acting pursuant to a seizure warrant issued by Chief Magistrate Judge Naomi Reice Buchwald, seized the Phiale from Steinhardt's home in New York City. Magistrate Judge Buchwald issued the warrant pursuant to 18 U.S.C. § 545 and to 19 U.S.C. § 1595a, finding that the Government had shown probable cause to believe that the Phiale was subject to civil forfeiture.

On December 13, 1995, the United States filed the current civil forfeiture action, seeking forfeiture of the Phiale pursuant to 18 U.S.C. §§ 545 and 981(a)(1)(C) and to 19 U.S.C. § 1595a(c). The Government's Complaint, as amended on February 13, 1995, alleged that the Phiale had been imported illegally into the United States due to the materially false statements provided by Haber in the Customs forms relating to the Phiale's country of origin. In addition, the Complaint alleged that the Phiale had been exported illegally from Italy pursuant to Article 44 of Italy's Law of June 1, 1939, No. 1089, regarding the Protection of Objects of Artistic and Historic Interest.[25]

On December 26, 1995, Steinhardt filed the pending motion for summary judgment against the United States in the forfeiture action, claiming that the Phiale is not subject to forfeiture under 18 U.S.C. §§ 545 or 981(a)(1)(C) or under 19 U.S.C. § 1595a(c). Specifically, Steinhardt contends that any alleged misstatements by Haber at the time of the Phiale's importation were not material, as required by the statutes. Steinhardt further asserts that he is an innocent owner as a matter of law under each of the statutes. Finally, Steinhardt argues that forfeiture of the Phiale would violate the Excessive Fines Clause of the Eighth Amendment.

On May 16, 1996, the United States filed its opposition to Steinhardt's motion and cross-moved for summary judgment. The Government argues that: (1) Steinhardt lacks standing to challenge forfeiture of the Phiale because it belongs to Italy; (2) neither 18 U.S.C. § 545 nor 19 U.S.C. § 1595a(c) provides for an "innocent owner defense;" and (3) forfeiture of the Phiale does not violate the Excessive Fines Clause of the Eighth Amendment.

## DISCUSSION

### I. The Applicable Standard for Summary Judgment

■ Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the nonmoving party's burden to "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Information Co.*, 970 F.2d 1110, 1112 (2d Cir.1992). In deciding cross-motions for summary judgment, the Court considers each motion separately, and on each views the facts in the light most favorable to the nonmoving party. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993).

■ "A fact is material when its resolution would 'affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'." *General Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1452 (2d Cir.1991)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

25. The Court has been supplied with a translation of the Italian law as well as an analysis of that law by Avv. Giuliano Berruti, an Italian lawyer and expert on cultural property. *See* Translation of Italy's Law of June 1, 1939, No. 1089, submitted as Government Exhibit 19; March 5, 1996 Affidavit of Giuliano Berruti, submitted as Government Exhibit 16, and May 10, 1996 Affidavit of Giuliano Berruti, submitted as Government Exhibit 1 of the Government's May 16, 1996 Reply Memorandum of Law (hereinafter collectively "Berruti Reports").

Claimant has proffered no expert opinion on Italian law to controvert Berruti's interpretation.

Pursuant to the Italian law, archaeological finds and objects of antiquity belong to the Italian state, unless a party can establish private ownership of the object pursuant to a legitimate title that predates 1902, the year in which the first Italian law protecting antiquities went into effect.

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Where undisputed material facts are properly placed before the Court, "those facts will be deemed admitted, unless they are properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir.1992).

## II. *Standing*

■ As an initial matter, the Government contends that Steinhardt lacks standing to challenge forfeiture of the Phiale. The Court disagrees.

■ To establish standing in a civil forfeiture proceeding, a claimant must demonstrate some ownership or possessory interest in the property at issue. *Mercado v. United States Customs Serv.*, 873 F.2d 641, 644 (2d Cir.1989). A claimant may prove this interest "by actual possession, dominion, control, title, or financial stake." *United States v. Contents of Account Numbers 208–06070 & 208–06068–1–2*, 847 F.Supp. 329, 333 (S.D.N.Y.1994).

It is undisputed that Steinhardt exercised actual possession, dominion and control over the Phiale from the time he took possession of and displayed it his home in 1992 until it was seized on November 9, 1995. In addition, Steinhardt has a financial stake in the resolution of this civil forfeiture action. As these facts demonstrate sufficient ownership of or possessory interests in the Phiale, Steinhardt has standing to contest the Government's forfeiture action.

## III. *The Relevant Forfeiture Statutes*

The Government seeks civil forfeiture of the Phiale pursuant to 18 U.S.C. §§ 545 and 981(a)(1)(C) and to 19 U.S.C. § 1595a(c).

**26.** Section 545 provides, in relevant part:

"Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been brought into the United States contrary to law [shall be guilty of a crime.]
. . .
Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in

■ The Government bears the initial burden of establishing that there is probable cause to believe that the Phiale is subject to forfeiture under any statute. *United States v. Two Parcels of Property Located at 19 & 25 Castle Street*, 31 F.3d 35, 39 (2d Cir.1994). To meet this burden, the Government must show "reasonable grounds, rising above the level of mere suspicion, to believe that [the] property is subject to forfeiture." *United States v. One Parcel of Property Located at 15 Black Ledge Drive, Marlborough, Conn.*, 897 F.2d 97, 101 (2d Cir.1990). Once the Government has met this burden, the burden of proof shifts to the claimant to show by a preponderance of the evidence that the Phiale is not, in fact, subject to forfeiture. *United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483, 487 (2d Cir.1995).

### A. *18 U.S.C. § 545*

Section 545 of Title 18 of the United States Code prohibits the importation of merchandise in a manner contrary to law.[26] The Government contends that Haber violated Section 545 by making materially false statements on the Customs forms in violation of 18 U.S.C. § 542. Specifically, the Government claims that Haber falsely identified the Phiale's country of origin as "CH" or Switzerland, rather than Italy, on the Customs forms.

### 1. *Importation "Contrary to Law"—Violation of 18 U.S.C. § 542*

■ Section 542 of Title 18 of the United States Code prohibits the making of false statements on various documents including Customs forms.[27] 18 U.S.C. § 542. For

the first or second paragraph of this section, shall be forfeited to the United States."
18 U.S.C. § 545.

**27.** Section 542 provides, in relevant part:

"Whoever enters or introduces ... into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, ... or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to

purposes of the statute, an allegedly false statement must be material. *See United States v. Holmquist,* 36 F.3d 154, 157 (1st Cir.1994), *cert. denied,* 514 U.S. 1084, 115 S.Ct. 1797, 131 L.Ed.2d 724 (1995); *United States v. Bagnall,* 907 F.2d 432, 435 (3d Cir.1990); *United States v. Teraoka,* 669 F.2d 577, 578 (9th Cir.1982).

■ The parties disagree, however, over the standard the Court should employ to determine the materiality of Haber's statements on the Customs forms. Steinhardt, citing *Teraoka* and *United States v. Meldish,* 722 F.2d 26 (2d Cir.1983), *cert. denied,* 465 U.S. 1101, 104 S.Ct. 1597, 80 L.Ed.2d 128 (1984), urges the Court to apply a rigid "but for" standard, under which the statements in the Customs forms are not material unless the Government can show that but for those statements the Phiale would not have been permitted into the country.[28]

The Government, citing *Bagnall* and *Holmquist,* argues that a statement is material "not only if it is calculated to effect the impermissible introduction of ineligible or restricted goods, but also if it affects or facilitates the importation process in any other way." *Bagnall,* 907 F.2d at 436; *see also Holmquist,* 36 F.3d at 159 (holding that false statement is material "if it has the potential significantly to affect the integrity or operation of the importation process as a whole").

The standard proposed by the Government is consistent with the language of the statute, which prohibits importations "by means of" false statements. "By means of" implies that a person has made a false statement at some significant stage in the importation process, not that the importation could not otherwise have been achieved. *See Holmquist,* 36 F.3d at 159 (" 'by means of' [in Section 542] is not synonymous with 'because of' ").

■ This standard is also consistent with the fundamental purpose of the statute, which is to "ensure full disclosure in importation and thereby maintain the integrity of the importation process as a whole ." *Holmquist,* 36 F.3d at 160 (citing *Bagnall,* 907 F.2d at 436). Applying a rigid "but for" standard, as Steinhardt proposes, would thwart this purpose by preventing prosecution of many statements that unquestionably are false and deleterious to the importation process, but nonetheless cannot be proven to be the crucial factor in an object's admission through Customs.

Moreover, this standard is consistent with the materiality standard applied in other false-statement contexts. *See, e.g., Kungys v. United States,* 485 U.S. 759, 770–71, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)(applying "natural tendency to influence" standard to 8 U.S.C. § 1451(a), denaturalization statute); *United States v. Regan,* 103 F.3d 1072, 1081 (2d Cir.) (applying "natural tendency to influence" standard to 18 U.S.C. § 1623, perjury statute), *cert. denied,* —— U.S. ——, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997); *United States v. Ali,* 68 F.3d 1468, 1474–75 (2d Cir. 1995) (applying "natural tendency to influence" standard to 18 U.S.C. § 1001, false statements statute).[29]

Having considered these cases and the parties arguments, the Court determines

---

any matter material thereto without reasonable cause to believe the truth of such statement [shall be guilty of a crime .]"
18 U.S.C. § 542.

**28.** In an argument that merits little response, Steinhardt claims that listing "CH" on the Customs Forms was not a "misstatement of fact" because Customs also received an invoice describing the Phiale as "one gold bowl—classical" and dating the object as "c. 450 B.C." According to Steinhardt, because there was no Switzerland in 450 B.C., the Customs Service was "on notice as to the true origin of the phiale."

This argument is frivolous. The Customs forms required Haber to declare the country of origin of the Phiale. Clearly, an object that has

been within the geographic boundary of what is now Italy for over 2000 years, and that was purchased from an Italian dealer in Italy, is "from" Italy. To declare it as being from Switzerland was a misstatement.

**29.** *See also United States v. Kross,* 14 F.3d 751, 753–54 (2d Cir.) (false statements in civil deposition), *cert. denied,* 513 U.S. 828, 115 S.Ct. 99, 130 L.Ed.2d 48 (1994); *Pacific Indem. Co. v. Golden,* 985 F.2d 51, 56 (2d Cir.1993) (false statements in investigation for insurance litigation); *United States v. Greenberg,* 735 F.2d 29, 30 (2d Cir.1984) (false statements in tax returns); *Goodridge v. Harvey Group Inc.,* 728 F.Supp. 275, 281 (S.D.N.Y.1990) (omissions in Rule 10b–5 shareholder suits).

that the standard for materiality under Section 542 is whether the false statement had a natural tendency to influence the actions or decisions of the Customs Service.[30]

██ Applying this materiality standard here, the Court finds that the statements in the Customs forms—misidentifying Switzerland as the country of origin—were materially false and in violation of Section 542.

Customs' procedures provide that the country of origin is a significant factor in determining whether Customs officials should admit an object, hold it for further information, or seize it as smuggled, improperly declared or undervalued. *See* Government Exhibit 20, Customs Directive No. 5230–15. Since certain countries have stringent laws to protect their cultural and artistic heritage, identification of such a country raises a red flag to Customs officials who are reviewing Customs forms. Italy is known to be such a country; Switzerland is not.

Truthful identification of Italy on the customs forms would have placed the Customs Service on notice that an object of antiquity, dated circa 450 B.C., was being exported from a country with strict antiquity-protection laws. This information would have been useful to the agency's determination, and could have prevented Haber from bringing the Phiale into the country illegally. Certainly, such information would have had a tendency to influence the Customs Service's decision-making process and to significantly affect the integrity of the importation process as a whole.

Based on these facts, the Court concludes that the Government has met its burden of establishing that there is probable cause to believe that the Phiale is subject to forfeiture pursuant to 18 U.S.C. § 545 as merchandise imported contrary to law in violation of 18 U.S.C. § 542.

The burden of proof, therefore, shifts to Steinhardt to show by a preponderance of the evidence that the Phiale is not, in fact, subject to forfeiture.

### 2. Availability of an Innocent Owner Defense Under 18 U.S.C. § 545

██ To meet this burden, Steinhardt argues that even if the Phiale is subject to forfeiture pursuant to 18 U.S.C. § 545, he has a complete defense to forfeiture because he is an innocent owner. The Court disagrees, finding that Section 545 does not afford an innocent owner defense.

Property may be subject to forfeiture regardless of the guilt or innocence of its owner. *See Bennis v. Michigan,* 516 U.S. 442, 116 S.Ct. 994, 998–1000, 134 L.Ed.2d 68 (1996) (noting "well-established authority rejecting the innocent-owner defense"). Where, as here, a statute is silent as to the availability of an innocent owner defense, the Supreme Court has made clear that courts should not read such a defense into the statute. *Id.* 116 S.Ct. at 999–1000.

Section 545 contains no express provision for an innocent owner defense.[31] *Compare* 18 U.S.C. § 981(a)(2) ("No property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder."). Availability of the defense, therefore, turns on whether there is language in the statute from which to infer such a defense.

Steinhardt claims that the language "recovered from any person" in Section 545 impliedly limits forfeiture to merchandise in the possession of an individual who has violated the statute. A review of the legislative history, however, demonstrates that that lan-

---

**30.** Steinhardt's reliance on *Meldish* does not require a different result. The *Meldish* court did not address the issue of materiality or express an intent to adopt the "but for" standard discussed in *Teraoka.* Rather, the court merely cited *Teraoka* as support for a general description of the underlying purpose of Section 542; nothing in that description is incompatible with the materiality standard applied by the Court here.

**31.** The forfeiture provision of section 545 reads as follows:

"Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in the first or second paragraph of this section, shall be forfeited to the United States."

18 U.S.C. § 545.

guage relates only to situations where the merchandise to be seized was lost and the Government now seeks to recover its value. It has no relevance to situations, such as here, where the Government seeks forfeiture of the merchandise itself.

Prior to 1954, the statute read, "[m]erchandise introduced into the United States in violation of this section shall be forfeited to the United States." *See* Act of Sept. 1, 1954, 1954 U.S.C.C.A.N. 3900, 3907. A problem arose when the Government sought to claim the value of merchandise that was unavailable for seizure. *See National Atlas Elevator Co. v. United States,* 97 F.2d 940, 944 (8th Cir.1938) (statute providing "such merchandise shall be forfeited" did not permit Government to retrieve "value of goods which are made subject to forfeiture but which have never been seized"). To address this, Congress amended the statute in 1954 to add the clause "or the value thereof, to be recovered from any person described in the first or second paragraph of this section." *See* Act of Sept. 1, 1954, 1954 U.S.C.C.A.N. 3900, 3907. By this amendment, Congress meant to allow the Government to reach profits from criminal offenders who had already moved their merchandise beyond the Government's reach. The amendment, however, did not modify the first part of the provision dealing with forfeiture of illegal merchandise itself. *Id.* In such cases, the merchandise is still available for forfeiture and the Government need not seek its value.[32]

As such, Section 545 does not permit an innocent owner defense. Because Steinhardt has not produced any other evidence to support his claim, Steinhardt has failed to meet his burden of showing by a preponderance of the evidence that the Phiale is not subject to forfeiture pursuant to Section 545. Accordingly, the Government's motion for summary judgment pursuant to 18 U.S.C. § 545 is granted.

### B. *19 U.S.C. § 1595a(c)*

As an alternative basis, the Government argues that the Phiale is subject to forfeiture pursuant to 19 U.S.C. § 1595a(c) [33] as stolen property imported contrary to law in violation of 18 U.S.C. § 2314, the National Stolen Property Act.

■ Section 2314 of Title 18 of the United States Code prohibits the importation of merchandise known to be stolen at the time of import.[34] 18 U.S.C. § 2314. Under Section 2314, an object may be considered "stolen" if a foreign nation has assumed ownership of the object through its artistic and cultural patrimony laws. *United States v. McClain,* 593 F.2d 658, 664–65 (5th Cir.), *cert. denied,* 444 U.S. 918, 100 S.Ct. 234, 62 L.Ed.2d 173 (1979); *United States v. Hollinshead,* 495 F.2d 1154, 1155–56 (9th Cir. 1974).

■ Issues involving the interpretation of foreign law are determined by the Court as a matter of law. *See* Fed.R.Civ. Proc. 44.1; Fed.R.Crim.Proc. 26.1. Here, having reviewed the relevant Italian law and the submissions of the parties, including the expert opinion of Avv. Giuliano Burruti, *see* Berruti Reports, the Court concludes that the Phiale belongs to Italy pursuant to Article 44 of Italy's law of June 1, 1939, No. 1089. Accordingly, the Court finds that the Phiale

---

**32.** Steinhardt's reliance on *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), and *United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor",* 691 F.2d 603 (2d Cir.1982), is to no avail. *Tintoretto* relied on dicta from *Calero–Toledo* —the same dicta now used by Steinhardt—which the Supreme Court has since stated should not be relied on to create an innocent owner defense. *Bennis,* 116 S.Ct. at 999.

**33.** Section 1595a(c) provides, in relevant part: "Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:

(1) The merchandise shall be seized and forfeited if it—
(A) is stolen, smuggled, or clandestinely imported or introduced."
19 U.S.C. § 1595a(c).

**34.** Section 2314 provides, in relevant part:

"Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud [shall be guilty of a crime]."
18 U.S.C. § 2314.

is "stolen" within the meaning of Section 2314.

■ Next, the Court considers whether the Government has shown probable cause to believe that Haber knew the Phiale was stolen at the time he imported it.

In November, 1991, Haber traveled to Sicily to meet Veres and to see the Phiale in person. Sometime later, he told Steinhardt that the Phiale was the twin of one belonging to the Metropolitan Museum of Art, and that its seller was a Sicilian coin dealer.

In negotiating for the Phiale on behalf of Steinhardt, Haber provided for a full refund if the Phiale was seized by Customs or claimed by a country or governmental agency. He also inserted a provision in the Terms of Sale that Dr. Manganaro would write a letter certifying that he saw the Phiale fifteen years ago in Switzerland. In fact, Dr. Manganaro claims to have never agreed to write this letter.

To acquire the Phiale, Haber took great effort to ensure that the Phiale was not exported directly from Italy. After arriving in Zurich, Haber traveled across the Swiss Alps to Lugano, a town near the Swiss–Italian border that is about a three-hour car drive from Zurich. There, he took possession of the Phiale and received a commercial invoice dating the Phiale as circa 450 B.C. Haber then traveled back to Zurich, rather than to a closer Italian city such as Milan, to fly back to New York.

Upon entry to the United States, Haber, assisted by his customs broker, succeeded in importing the Phiale through the use of two materially false Customs forms.

■ Finally, following seizure of the Phiale and commencement of the current action, Haber invoked the Fifth Amendment at a deposition and refused to answer any questions regarding the Phiale's purchase or importation. *See* Haber Deposition. From this fact, the Court can draw an adverse inference against Haber that he knew the Phiale was stolen at the time he imported it. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Brink's Inc. v. City of New York,* 717 F.2d 700, 709 (2d Cir.1983).

Based on these undisputed facts, the Court finds probable cause to believe that Haber knew the Phiale was stolen when he imported it. Accordingly, the Government has met its burden of showing that the Phiale is subject to forfeiture pursuant to 19 U.S.C. § 1595a(c), as stolen merchandise imported in violation of 18 U.S.C. § 2314.

Against this finding of probable cause, Steinhardt offers no facts to suggest that the Phiale is not, in fact, subject to forfeiture. Moreover, Section 1595a(c) does not provide for an innocent owner defense. *See Bennis,* 116 S.Ct. at 999–1000.

The Government's motion for summary judgment pursuant to 19 U.S.C. § 1595a(c) is granted.[35]

### IV. *Eighth Amendment*

■ Steinhardt's final argument is that forfeiture of the Phiale violates the Excessive Fines Clause of the Eighth Amendment. The Court disagrees.

■ The Eighth Amendment applies to civil *in rem* forfeitures only where the forfeiture constitutes punishment in some part. *Austin v. United States,* 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). Where the seized goods are contraband, however, forfeiture may be characterized as remedial because it removes dangerous or illegal items from society. *Austin,* 509 U.S. at 621 (citing *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 364, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984) (holding that forfeiture of contraband is remedial sanction that does not constitute punishment for double jeopardy purposes)).[36]

---

35. In view of the Court's findings with respect to 18 U.S.C. § 545 and 19 U.S.C. § 1595a(c), the Court need not reach Steinhardt's motion for summary judgment pursuant to 18 U.S.C. § 981(a)(1)(C).

36. *See also Bennis,* 116 S.Ct. at 1004 (Stevens, J., dissenting) (noting that forfeiture of "pure contraband" serves "obvious remedial" purpose of removing illegal items from private circulation).

■ Goods such as the Phiale imported in violation of customs laws are contraband. *See Bennis*, 116 S.Ct. at 1004 (Stevens, J., dissenting) (characterizing smuggled goods as "pure contraband"). Forfeiture of these goods serves remedial rather than punitive purposes because it prevents forbidden merchandise from circulating in the United States and reimburses the Government for investigation and enforcement expenses. *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972).[37]

Accordingly, forfeiture of the Phiale—contraband imported in violation of the customs laws—is remedial and does not constitute "punishment" implicating the Eighth Amendment.[38] *See United States v. $50,000 in United States Currency*, 93 Civ. 3874, 1994 WL 75145 (N.D.Ill. March 9, 1994) (holding that Eighth Amendment is not implicated in forfeiture of money transported in violation of reporting requirements of 31 U.S.C. § 5317).

■ Even if the Eighth Amendment were implicated, the Court finds that forfeiture of the Phiale would not be unconstitutional. In determining the excessiveness of a forfeiture, the Court considers (1) the harshness of the forfeiture (the nature and value of the property and the effect of forfeiture on innocent third paries) in comparison to the gravity of the offense and the sentence that could be imposed on the perpetrator of such an offense; (2) the relationship between the property and the offense; and (3) the role and degree of culpability of the owner of the property. *United States v. Milbrand*, 58 F.3d 841, 847–48 (2d Cir.1995).

Here, forfeiture of the Phiale is not particularly "harsh." Pursuant to the Terms of Sale, Steinhardt is entitled to a full refund of the purchase price because the Phiale was seized and claimed by both a governmental agency and country.[39] At the same time, the offense at issue here is grave; it involves the trafficking of a cultural antiquity by means of false statements.

Second, as Steinhardt concedes, the property and offense are coextensive.

Third, the extent of Steinhardt's culpability is unclear. Steinhardt's experience as an art collector (and specifically his experience with Haber) and the fact that, in the purchase agreement, he provided for the risk of seizure that eventually occurred, both detract from his claim of innocence. Even assuming that he is an innocent owner, however, the Court finds that this third factor is outweighed by the first and second factors.

Accordingly, the Court finds that forfeiture of the Phiale is not unconstitutionally excessive and does not violate Steinhardt's rights, if any, under the Eighth Amendment.

### CONCLUSION

For the reasons stated above, the Government's motion for summary judgment pursuant to 18 U.S.C. § 545 and to 19 U.S.C. § 1595a(c) is granted.

The clerk is directed to enter judgment.

**SO ORDERED.**

---

**37.** *See also United States v. Proceeds From Sale of Approximately 15,538 Panulirus Argus Lobster Tails*, 834 F.Supp. 385, 391 (S.D.Fla.1993) (forfeiture of lobster tails imported in violation of Lacey Act, 16 U.S.C. § 3371 *et seq.*, characterized as purely remedial because tails were contraband).

**38.** In this connection, the Phiale is not the proceeds of a crime and is more than the instrumentality of a crime. It is, rather, the precise substance of the unlawful act. As such, Steinhardt's reliance on cases in which the Government seized proceeds from or instrumentalities of a crime is misplaced. *See, e.g., United States v. Van Brocklin*, 115 F.3d 587, 601–02 (8th Cir.

1997) (fine and forfeiture of proceeds in bank fraud scheme); *United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483 (2d Cir. 1995) (forfeiture of car lot used to sell stolen car parts); *United States v. Milbrand*, 58 F.3d 841 (2d Cir.1995) (forfeiture of land used as instrumentality in marijuana production), *cert. denied*, 516 U.S. 1182, 116 S.Ct. 1284, 134 L.Ed.2d 228 (1996).

**39.** Insofar as Steinhardt is innocent of any wrongdoing, his dispute should be with Haber or Veres and not with the Governments of the United States or Italy.