## GOVERNMENT OF PERU, Plaintiff,

### v.

**Benjamin JOHNSON, Lawrence Wendt, David Swetnam, Jacqueline Swetnam, George Gelsebach, Oman Gaspar, Ronald Stanman and 352 Peruvian Artifacts, Defendants.**

### No. CV 88–6990–WPG.

United States District Court,
C.D. California.

June 29, 1989.

· W. Noel Keyes, Corona Del Mar, Cal., George H. Wu, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff.

Terry W. Bird, Ronald J. Nessim, Bird, Marella, Boxer, Wolpert & Matz, Los Angeles, Cal., James F. Fitzpatrick, Edward L. Wolf, Arnold & Porter, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION

GRAY, District Judge.

The Government of Peru, plaintiff in this action, contends that it is the legal owner of eighty-nine artifacts that have been seized by the United States Customs Service from defendant Benjamin Johnson. The plaintiff charges the defendant with conversion of these articles and seeks an order for their return. Judgment will be rendered for the defendant.

Irrespective of the decision in this matter, the court has considerable sympathy for Peru with respect to the problems that it confronts as manifested by this litigation. It is evident that many priceless and beautiful Pre–Columbian artifacts excavated from historical monuments in that country have been and are being smuggled abroad and sold to museums and other collectors of art. Such conduct is destructive of a major segment of the cultural heritage of Peru, and the plaintiff is entitled to the support of the courts of the

United States in its determination to prevent further looting of its patrimony.

However, there is substantial evidence that Mr. Johnson purchased the subject items in good faith over the years, and the plaintiff must overcome legal and factual burdens that are heavy indeed before the court can justly order the subject items to be removed from the defendant's possession and turned over to the plaintiff. The trial of this action has shown that the plaintiff simply cannot meet these burdens.

### 1. *The Plaintiff Cannot Establish That The Subject Artifacts Were Excavated In Modern Day Peru.*

■ The plaintiff has no direct evidence that any of the subject items came from Peru. It alleges, on information and belief, that they were taken from Peru or excavated from archeological sites in that country. The plaintiff's principal witness was Dr. Francisco Iriarte, who, according to the plaintiff's counsel, is Peru's foremost archeologist in Pre–Columbian artifacts. Dr. Iriarte examined each of the eighty-nine artifacts and in almost every instance asserted that he recognized it as an item of Peruvian style and culture, and he usually asserted the belief that it came from a particular excavation site or specific area in Peru. I have no doubt that Dr. Iriarte has seen artifacts taken from those respective locations that are very similar to the items that he was examining in court. However, Dr. Iriarte admitted that Peruvian Pre–Columbian culture spanned not only modern day Peru, but also areas that now are within the borders of Bolivia and Ecuador, and many of the population centers that were part of the Peruvian Pre–Columbian civilization, and from which artifacts have been taken, are within those countries. The fact that the subject items are identifiable with excavation sites in modern Peru does not exclude the possibility that they are equally similar to artifacts found in archeological monuments in Bolivia and Ecuador. Indeed, the evidence shows that at least one of the subject items is very similar to a figure depicted in a photograph that appears in an article concerning the cultural anthropology of Ecuador.

Moreover, Columbia also borders Peru, and customs documents that appear to pertain to some of the subject items assert Columbia to be the country of origin. Such an assertion is, of course, hearsay and, even though the documents may be business records kept in ordinary course, they should not be given great weight. However, they do further point up the difficulty that the court has in concluding that any specific one of the items concerned in this action originated within the present boundaries of Peru.

I was impressed by Dr. Iriarte's testimony. He doubtless is knowledgeable in his field and honest in his beliefs. He also has a genuine interest in helping his country recover artifacts that are such an important part of its patrimony, and this desire necessarily plays a part in his conclusions as to the origins of the objects at issue. In some instances, he admitted that an item may have come from Ecuador or Columbia or Mexico or even Polynesia, but nonetheless retained the opinion that it had been found in a particular area of Peru, due to its similarity to other objects taken from that site. Because of the many other possibilities, this court cannot base a finding of ownership upon such subjective conclusions. We are far from certain as to the country of origin of any of the artifacts here concerned. This unfortunate circumstance precludes an adjudication that they came from Peru.

### 2. *The Plaintiff Cannot Establish Its Ownership At The Time Of Exportation.*

Even if it were to be assumed that the artifacts came from Peru, in order for the plaintiff to recover them, it must prove that the Government of Peru was the legal owner at the time of their removal from that country. Such ownership depends upon the laws of Peru, which are far from precise and have changed several times over the years.

■ (a) *1822—1929.* The plaintiff, in its Second Post Trial Brief, submitted for the first time copies of the statutes upon which it relies to establish that, from 1822 to the present time, Peru owned the artifacts lo-

cated in that country. However, in its pleadings, its responses to discovery requests, and its pretrial memoranda, the plaintiff identified Law No. 6634 of June 13, 1929, as the earliest enactment that formed the legal basis for its ownership claims. Federal Rule of Civil Procedure 44.1 provides that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." I find that initial presentation of these purported pre–1929 enactments after the case has been tried cannot constitute "reasonable notice", and I decline to consider them in rendering this decision.

■ In any event, the plaintiff's present reliance upon pre–1929 law is sustantially undercut by the trial testimony of its expert witness on Peruvian law, Roberto MacLean, a former Chief Justice of the Supreme Court of that country. In response to a question regarding Peru's statutes concerning government ownership of Pre–Columbian artifacts, he said: "even though there are several rules which have some academic importance but for all practical purposes the first law is from 1929; if I recall correctly from 13 of June of 1929."

The defendant's expert, Professor Alan Sawyer, whose qualifications concerning artifacts are comparable to those of Dr. Iriarte, testified that it is impossible to determine from examination of the items here concerned when they were excavated or left the country of origin, and that many Peruvian artifacts were brought into the United States before 1929. It follows that if any of the subject items left Peru before 1929, the plaintiff cannot claim ownership of them.

■ (b) *1929–1985.* A written opinion by Professor MacLean asserts that what Law No. 6634 means "is that if a person found an archeological object before June of 1929 this object belongs to him; but if that person found the object after June 1929 it belongs to the State." Article 11 of Law No. 6634 provides that privately owned Pre–Columbian artifacts must be registered in a special book "which shall be opened at the National Museum of Histo-

ry", and that any "[o]bjects which, after one year beginning on the day the book is opened, have not been registered, shall be considered the property of the State."

From the record at the trial, I cannot determine when the "special book" called for by Article 11 was opened or whether it ever has been opened. Interrogatory No. 9, propounded to the plaintiff by the defendant, asks for the date or approximate date upon which the special book was "opened"; the response was that "[t]his date is unknown." The plaintiff submitted a supplemental answer which said that the "so called 'book' is a card registry" that has been "adequately ordered since 1969 to date." The response further states that "[u]p to the year 1972 the books are found at the National Museum of Anthropology and Archeology, since 1972 to date, the books are found at the 'Museum of the Nation'." The record does not show whether either of these named institutions is the same as the National Museum of History, where the special book was to be opened.

On January 5, 1985, Law No. 6634 was repealed and replaced by Law No. 24047. According to Professor MacLean's written opinion, "[a]fter that date there is also the obligation for private persons to register their archeological objects and if they do not comply with this obligation that *could* mean that the objects belong to the State." (Emphasis added.)

In undertaking to evaluate Peru's ownership claims in this confusing situation, I am assuming that none of the artifacts have been duly registered. However, I do not know whether the repeal of Law No. 6634 nullifies the registration requirement therein contained. If it does, a private owner could have retained an unregistered item through January 1985 without losing his title. In any event, if the private owner caused his unregistered artifact to be removed from Peru within one year following the opening of the "special book" (whenever that may have occurred), title would not have been transferred from such person to the plaintiff.

(c) *From January 1985 To The Present.* As is mentioned above, on January 5, 1985, the 1929 law was repealed and replaced by Law No. 24047. Professor MacLean's written opinion states that under the latter statute "if a person finds after 5th January of 1985 an archeological object it can belong to him." The next relevant official document is a Supreme Decree of the President of Peru, dated February 27, 1985, which proclaims that Pre–Hispanic artistic objects "belonging to the nation's cultural wealth are untouchable," and that their removal from the country is categorically forbidden. This Decree does not clearly establish state ownership of any such art objects. However, on June 22, 1985, a new statute provided specifically that all archeological sites belong to the state. "So if a private person digs a site and excavates its objects [he] is taking somebody else's property", according to Professor MacLean's written opinion. Thus, it would appear that if any artifacts here concerned were privately excavated between January 5 and June 22, 1985, they would constitute private property, rather than being owned by Peru.

### 3. *Michael Kelly's Testimony Does Not Establish Peru's Ownership.*

Mr. Michael Kelly testified that in August 1987 he brought to Mr. Johnson's home in California certain artifacts that he believed to have come from Peru. But all of his information as to the country of origin of these items was strictly hearsay. I am also skeptical of Mr. Kelly's ability to identify any of the specific objects here concerned as having been part of the 1987 shipment. Some of the subject items doubtless were in Mr. Johnson's home when Mr. Kelly was present, and he well may have seen them. However, Mr. Johnson submitted documents that quite clearly established his having purchased many of them in the United States well before 1987.

Despite Mr. Kelly's testimony, which was designed to show that Mr. Johnson was implicated in, or at least was aware of, the smuggling activities of Mr. Kelly and Mr. Swetnam, I am not satisfied that Mr. Johnson received any of the items here concerned with the knowledge that they were illegally removed from Peru.

### 4. *The Uncertainty Of The Domestic Application Of Peru's Ownership Laws.*

Official documents of Peru long have asserted, in one way or another, the interest of the state in preserving its artistic objects as "part of the national cultural wealth," that they are "untouchable, inalienable and inprescriptable," and that their removal from the country is "categorically forbidden." *See, e.g.,* Supreme Decree of February 27, 1985. Such declarations are concerned with protection and do not imply ownership. However, the law of June 13, 1929, does proclaim that artifacts in historical monuments are "the property of the State" and that unregistered artifacts "shall be considered to be the property of the State." Nonetheless, the domestic effect of such a pronouncement appears to be extremely limited. Possession of the artifacts is allowed to remain in private hands, and such objects may be transferred by gift or bequest or intestate succession. There is no indication in the record that Peru ever has sought to exercise its ownership rights in such property, so long as there is no removal from that country. The laws of Peru concerning its artifacts could reasonably be considered to have no more effect than export restrictions, and, as was pointed out in *United States v. McClain,* 545 F.2d 988, 1002 (5th Cir.1977), export restrictions constitute an exercise of the police power of a state; "[t]hey do not create 'ownership' in the state. The state comes to own property only when it acquires such property in the general manner by which private persons come to own property, or when it declares itself the owner."

The second time that the case of *United States v. McClain* came before the Fifth Circuit, the opinion stated: "It may well be, as testified so emphatically by most of the Mexican witnesses, that Mexico has considered itself the owner of all pre-Columbian artifacts for almost 100 years. If so, however, it has not expressed that view with sufficient clarity to survive translation

into terms understandable by and binding upon American citizens." 593 F.2d 658, 670 (5th Cir.1979). Under all of the above discussed circumstances, I find the same comment to be applicable here.

### 5. *Conclusion.*

Peru may not prevail in this action to recover the artifacts here concerned because:

(a) We do not know in what country they were found and from which they were exported.

(b) If they were found in Peru, we do not know when.

(c) We do not know if they were in private possession in Peru more than one year after the official registry book was opened.

(d) The extent of Peru's claim of ownership as part of its domestic law is uncertain.