**UNITED STATES of America Plaintiff**

v.

**ONE LUCITE BALL CONTAINING LUNAR MATERIAL (One Moon Rock) and One Ten Inch by Fourteen Inch Wooden Plaque Defendant In Rem**

**No. 01–0116CIVJORDAN.**

United States District Court,
S.D. Florida,
Miami Division.

March 24, 2003.

Names & Addresses, James Swain, AUSA, Of Counsel, Jonathan Zwibel, Esq., U.S. Customs Service, Miami, for Plaintiff.

Names & Addresses, Peter Stanwood Herrick, Miami, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

The United States seeks civil forfeiture *in rem* of one lucite ball containing lunar material, that is, a moon rock, and one 10 inch by 14 inch wooden plaque. It asserts that the moon rock and plaque are stolen property that were introduced into the United States in violation of 19 U.S.C. § 1595a(c)(1)(A). The claimant, Alan Rosen—who purchased the items from a retired Honduran colonel for $50,000—argues that he is entitled to the return of the property because, among other things, the government has failed to establish probable cause.

On March 3, 2003, the parties presented evidence (through testimony and matters already in the record) at a bench trial. As explained below, I find that the United States is entitled to forfeiture because the items were stolen from the Republic of Honduras and then introduced into the United States.

## I. FACTS

The moon rock was originally retrieved from the surface of the moon by astronauts on a NASA mission. In 1973, President Nixon, on behalf of the United States, made a gift of the moon rock and plaque to the government and people of the Republic of Honduras.

### A. MR. ROSEN'S ACQUISITION OF THE ITEMS

While in Honduras on business in early 1994, Mr. Rosen learned from a friend that a retired colonel from the Honduran military was seeking to sell a moon rock. When he found out that the asking price was $1 million, Mr. Rosen said he was not interested in purchasing it, as it "sounded to [him] like the Brooklyn Bridge." Sub-sequently, however, Mr. Rosen did some investigating, and learned that a slide with specks of lunar dust had sold at a Sotheby's auction for $500,000.

In 1995, Mr. Rosen returned to Honduras. While there, he met with Oscar Ruiz at the house of Jose Bayardo Moya Moya. Mr. Rosen mentioned the moon rock, and asked if the colonel might be willing to sell for a lower price. A meeting was arranged for the next day, and the colonel, Roberto Argurcia Ugarte, showed Mr. Rosen the case with the rock and the plaque. In the words of Mr. Rosen, Colonel Argurcia seemed "quite anxious to sell it." Mr. Rosen testified that Colonel Argurcia told him he had been given the items as a gift after a coup d'etat sometime around 1973. Colonel Argurcia, however, did not have any ownership documents.

On May 15, 1995, Mr. Rosen, Mr. Bayardo, and Colonel Argurcia agreed that Mr. Rosen would pay $50,000 for the moon rock and plaque. The written document, however, does not appear to be a bill of sale, but rather an assignment. In it, Colonel Argurcia agrees to give the items to Mr. Rosen "for marketing," and "[i]n the event the relic is not sold to a third party within a period of ninety days, said relic shall be returned ..." Mr. Rosen testified that notwithstanding the written assignment, the actual agreement was for the sale of the items to him, and the clause providing for their return if not sold was included to protect him in case the moon rock and plaque were not genuine. Mr. Rosen initially paid $10,000 in cash, and also gave Colonel Argurcia—through Mr. Bayardo, the middleman—a refrigerated truck worth about $15,000.

Mr. Rosen then returned to the United States and attempted to raise additional money for the purchase of the moon rock and plaque. In April of 1996, Mr. Rosen spoke to Mr. Bayardo and told him he had

raised an additional $5,000. Mr. Bayardo responded that someone would be coming to Miami to meet with him. The meeting took place at a Denny's restaurant near the airport. Mr. Rosen gave the individual who met him the $5,000 in exchange for the moon rock and plaque.[1]

Following his receipt of the items, Mr. Rosen went to Massachusetts to set up a microprobe study to verify that the rock was actually lunar material. He contacted David Lange, an electron microprobe specialist at Harvard University. Initially, Mr. Lange did not want to get involved because of the possibility that the rock might be actual lunar material. He eventually agreed, however, to conduct the analysis. On November 12, 1996, he sent a letter to Mr. Rosen indicating that the mineral composition of the rock was consistent with lunar material. Mr. Rosen also received a letter from the Conservation Analytical Laboratory at the Smithsonian Institution stating that it appeared that the material was "lunar rock."

Mr. Rosen testified that he received one serious offer from a Swiss man who wished to purchase the moon rock to use in making a high-end line of watches for Omega. The man offered Mr. Rosen $500,000 and a percentage of the sale of the watches. Mr. Rosen declined this offer because he thought it was too low.

### B. The Sting

On October 14, 1998, Special Agent Joseph Gutheinz of the NASA Office of the Inspector General told United States Customs Service Special Agent David Atwood that Mr. Rosen had contacted him based upon a newspaper advertisement that had been placed by Agent Gutheinz in a national newspaper. The advertisement was placed under the name of an undercover company being run by Agent Gutheinz. The advertisement sought to purchase "moon rocks" and provided a return address for interested sellers to send pictures, documentary proof, and their asking price.

On September 29, 1998, an individual identified at that time only as "Alan" telephoned the undercover business and left a return phone number stating, "I think I have something for you." On September 30, 1998, Agent Gutheinz returned the telephone call to the number specified in the message and spoke to an individual who identified himself as Alan Rosen. Mr. Rosen stated that he had in his possession a moon rock that was approximately five grams in weight. He said that he was surprised to see the advertisement in the newspaper because most dealings are done under the table or in dark rooms or alleys. He further acknowledged that NASA considered any lunar material, including moon rocks, obtained during the Apollo missions to be illegal for anyone to own, buy, or in any way possess.

Agent Gutheinz asked Mr. Rosen what price he had in mind for the plaque. Mr. Rosen said that a sale of a similar plaque from the country of Nicaragua, along with some pre-Columbian artifacts, had sold to a middle-eastern buyer for between $5 and $10 million. Mr. Rosen said that he was looking for a proportional amount of money. He did not, however, wish to sell the entire moon rock. Instead, Mr. Rosen wanted to return the plaque and a small portion of the rock to the country of origin and have it placed in the presidential museum. Mr. Rosen said that if he sold the entire rock and plaque, he might have a duplicate/fraudulent plaque made for the country.

---

1. Mr. Rosen later paid an additional $5,000, leaving him with a balance of $15,000, which to this day has not been paid.

Mr. Rosen also told Agent Gutheinz that he had a web site on the internet. Agent Atwood accessed the internet site and confirmed that it contained information pertaining to the moon rock and plaque. The web site, though containing an image of the lunar material, obscured the Honduran flag and the presentation plaque. Mr. Rosen informed Agent Gutheinz that he had taken the rock to Harvard University to have it analyzed, and that the analysis had confirmed that the substance originated from the moon.

On October 14, 1998, Postal Inspector Robert Cregger, acting in an undercover capacity along with Agent Gutheinz, called Mr. Rosen using the alias "John Marta." He arranged a time and place to meet Mr. Rosen and negotiate the purchase of the moon rock and plaque. Inspector Cregger asked Mr. Rosen how he had come to possess the plaque if it was given to a foreign government. Mr. Rosen explained that he was approached by a retired military officer from the foreign country who was seeking to sell the items, and he decided after a year to purchase them. After repeated questioning about how the items got into the United States, Mr. Rosen told Inspector Cregger that it did not matter.

The following week, on October 20, 1998, Agent Gutheinz and Inspector Cregger met Mr. Rosen at a restaurant in North Miami Beach. Another individual accompanied Mr. Rosen and participated in the conversation pertaining to the purchase of the moon rock. Mr. Rosen provided Agent Gutheinz and Inspector Cregger with documents downloaded from his website, including a color photograph of the plaque. The plaque had two inscriptions. The first reads: "This fragment is a portion of a rock from the Taurus Littrow Valley of the Moon. It is given as a symbol of the unity of human endeavor and carries with it the hope of the American people for a world at peace." The second reads: "This flag of your nation was carried to the moon aboard Spacecraft American during the Apollo XVII mission. December 7–19, 1972. Presented to the people of the [name of country removed] from the people of the United States of America. Richard Nixon 1973."

Because he did not want to reveal the name of the country until the time of sale, Mr. Rosen informed the undercover agents that he had covered the center portion of the plaque where the country's flag was displayed. He said that there were five countries that have similar flag configurations and identified them as El Salvador, Nicaragua, Honduras, Argentina, and one other country that he could not remember. He stated that each of these countries had received a similar plaque. He described the plaque as being made of black maple with measurements of 10 inches by 14 inches.

Mr. Rosen also said that the moon rock weighed 1.142 grams, not the five grams he had previously mentioned.[2] He indicated that the weight of the rock was not at issue and again stated that the price for the entire moon rock and plaque was $5 million. Later that same day, Agent Gutheinz called the residence of Mr. Rosen on two occasions. He left a message on the first call, and on the second call he spoke to Mr. Rosen. During the conversation, Mr. Rosen told Agent Gutheinz that the reason he would not show them the plaque was not because he believed that they would steal it, but rather because he wanted to make sure that they were not working for the federal government with the intention of seizing the plaque and the moon rock.

---

2. According to NASA lunar curator Gary Lofgren, the weight of the moon rocks placed in the plaques given by President Nixon to several countries was approximately 1.1 grams.

On November 16, 1998, Agent Gutheinz called Mr. Rosen to further discuss the purchase of the plaque. During this recorded conversation, Mr. Rosen stated that the plaque had been presented to the country of Honduras. He also indicated that the plaque was stored in a safe deposit box at a Miami area bank. He said that he would allow a photograph to be taken of the plaque at the bank on Wednesday, November 18, 1998. United States Magistrate Judge Peter Palermo issued a warrant for the seizure of the moon rock and plaque that day, and the items were subsequently seized.

### C. HONDURAS' REQUEST

On May 4, 1999, Juan Alberto Lara Buesco, the Acting Vice–Secretary of State of Honduras, sent a letter to Customs Commissioner Raymond Kelly to seek the return of the moon rock and plaque, to identify it as the patrimony of the government and people of Honduras, and to confirm that it was illegally taken from Honduras. According to Jany del Cid Martinez, a Special Prosecutor for Ethnic Groups and Cultural Heritage, Office of the Public Prosecutor of Honduras, the items were stolen from the government and the people of Honduras in violation of several laws of Honduras, specifically, Article 223 and Article 225 of the Criminal Code; Article 2, paragraph 2, and Article 4 of the Law on the Protection of the Nation's Cultural Heritage; and Article 194 and Article 195 Number 5 of the National Tax Code.

### II. HONDURAN LAW

■ "[F]ederal law controls the question of whether an item is stolen," but "local law"—i.e., the law of the place from where the item was taken—governs "whether any person or entity has a property interest in the item such that it can be stolen and whether the receiver of the item has a property interest in it." *United*

*States v. Portrait of Wally*, 105 F.Supp.2d 288, 292 (S.D.N.Y.2000) (*Wally I* ) (forfeiture under 19 U.S.C. § 1595a(c) and 22 U.S.C. § 401(a)). Because the issue of title to the moon rock and plaque must be determined by reference to Honduran law, *see United States v. An Antique Platter of Gold*, 991 F.Supp. 222, 231–32 (S.D.N.Y. 1997) (forfeiture under 19 U.S.C. § 1595a(c) and 18 U.S.C. §§ 981(a)(1)(C) & 545), *aff'd on other grounds*, 184 F.3d 131 (2d Cir.1999), I make the following determinations pursuant to Federal Rule of Civil Procedure 44.1.

### A. PROFESSOR ROSENN'S REPORT

With the agreement of the parties, and pursuant to Federal Rule of Evidence 706(a), I appointed Professor Keith S. Rosenn, Esq., an expert in Honduran law and a law professor at the University of Miami School of Law, to conduct research on and analyze the issues of Honduran law as they related to the cultural patrimony of historic artifacts, and particularly as they related to the moon rock and wooden plaque. Professor Rosenn, who is no relation to the claimant, Mr. Rosen, was also authorized to conduct research into collateral matters of Honduran law to the extent he found necessary to prepare his report. Professor Rosenn issued his preliminary report in the form of a letter on March 25, 2002, was deposed on April 25, 2002, by both parties, and subsequently issued a revised report on October 10, 2002.

### B. THE MOON ROCK AND PLAQUE WERE TAKEN FROM THE PRESIDENTIAL PALACE BETWEEN 1990 AND 1994

Professor Rosenn determined that the moon rock and plaque became the property of the Republic of Honduras in 1973, when they were donated to that nation by President Nixon. Though the gift was accepted by the nation's then *de facto* lead-

er, President Oswaldo Lopez Arellano, Honduras, like most of Latin America, treats the acts of *de facto* governments as having the same force and effect as those of *de jure* governments. The moon rock and plaque were placed in the Presidential Palace, and viewed by the public. President Lopez Arellano was ousted by a military coup in 1975, as was his successor, Colonel Juan Alberto Melgar Castro. In 1981, General Paz Garcia, the leader of the military junta which ousted Colonel Castro, called for free elections, and since then Honduras has had a series of six democratically elected presidents.

Nothing in the record establishes exactly when the moon rock and plaque disappeared. Professor Rosenn reviewed articles that appeared in *La Prensa,* the main Honduran newspaper, to try to establish some sort of time frame for the disappearance. According to an article published in *La Prensa* on January 19, 1999, the moon rock and plaque disappeared during the administration of President Rafael Lonardo Callejas (1990–1994). Two other articles published in *La Prensa* in 1999 indicated that the Honduran prosecutor investigating the disappearance focused on the testimony of various ex-employees of the Presidential Palace during President Callejas' term, as well as on Pompeyo Bonilla, a former member of the military who served in the Casa de Gobierno and was then a member of the Chamber of Deputies.

█ As noted earlier, Mr. Rosen testified that Colonel Argurcia told him that he was given the moon rock and plaque as a gift sometime around 1973. Hearsay is admissible for some purposes in a forfeiture proceeding (such as establishing probable cause), *see, e.g., Nnadi v. Richter,* 976 F.2d 682, 686 (11th Cir.1992), but even if I were to credit Mr. Rosen's testimony about what he was told, I do not find Colonel Argurcia's statement about the date of acquisition credible. Colonel Argurcia had every incentive to lie about when he obtained the moon rock and plaque, did not have any documents establishing his ownership, first offered to sell the items for $1 million, and reduced his asking price to $50,000 just one year later.

Based upon the evidence in the record, and the fact that Mr. Rosen was offered the moon rock and plaque in 1994, I find, consistent with Professor Rosenn's report, that these items disappeared from the Presidential Palace in Honduras sometime between 1990 and 1994.

## C. THE MOON ROCK AND PLAQUE BECAME PART OF THE PATRIMONY OF THE REPUBLIC OF HONDURAS BY VIRTUE OF A COMPLETED GIFT FROM PRESIDENT NIXON IN 1973

A donation effectively transfers title to property when accepted by the donee under Honduran law. Articles 1296 and 1297 of the Civil Code provide as follows:

> Art. 1296. An *inter vivos* gift is an act by which one person transfers gratuitously and irrevocably all or part of property to another, who accepts it.

> Art. 1297. Those who can enter into contracts have the capacity to make and to accept donations except in cases in which the law expressly provides to the contrary.

When President Lopez Arellano accepted the gift on behalf of the Honduran government and people and placed it in the Presidential Palace, the lunar rock and plaque became part of the patrimony of the Republic of Honduras. That President Lopez Arellano was a *de facto* and not a *de jure* leader is immaterial under Honduran law, and his act of acceptance of the gift on behalf of Honduras has the same effect as if he had been a constitutionally elected head of state.

#### D. The 1984 And 1997 Honduran Laws For The Protection Of Cultural Patrimony Do Not Apply To The Moon Rock And Plaque

Though Honduras has enacted two Laws for the Protection of Cultural Patrimony, Decree No. 81–84 of May 30, 1984, and Decree No. 220–97 of December 29, 1997, neither law is applicable to the moon rock and plaque.

The 1997 law, which repealed the 1984 law, defines cultural patrimony to include moveable property (*bienes muebles*) such as engravings, paintings, sculptures, furnishings, jewelry, currency, weapons, dress items, machinery, tools, and other objects of anthropological and historic interest. The moon rock and plaque, which fit squarely into the category of objects of anthropological and historic interest, would therefore be non-exportable under the second sentence of Article 4 of the 1997 law, which prohibits exportation of any type of cultural good, except a part of cultural interchanges with express authorization. The difficulty lies, however, in the fact that the statute was not effective until the date of its publication in the Official Gazette, which was February 21, 1998.

Both the Constitution and the Civil Code of Honduras prohibit retroactive application of laws, unless they favor a criminal defendant. Article 96 of the Honduran Constitution provides that no law has retroactive effect, except in criminal matters when the new law favors the accused. Article 7 of the Civil Code includes an identical bar on such retroactive application. Because the moon rock and plaque disappeared from Honduras and were transported into the United States before February of 1998, the 1997 law is inapplicable.

The 1984 law was in effect at the time of the disappearance of the moon rock and plaque, but its language problematic. It provides:

> Art. 172. All the anthropological, archeological, historical and artistic wealth of Honduras forms part of the cultural patrimony of the Nation.
>
> The law shall establish the rules that will serve as the basis for its conservation, restoration, maintenance and restitution, as the case may be.
>
> It is the duty of all Hondurans to safeguard their [cultural patrimony] and to prevent its unlawful removal.
>
> Sites of natural beauty, monuments, and reserved zones shall be under the protection of the State.

Article 17 of the 1984 law prohibits the donation or sale of cultural property, and Article 28 prohibits such property from being alienated or taken out of the country. Article 5 defines six categories of cultural patrimony, but the only category relevant to the moon rock and plaque is "moveable property." Unlike the 1997 law, however, the 1984 law only includes objects of anthropological or historic interest if they were manufactured before 1900. Article 5 characterizes moveable property (*bienes muebles*) as

> [e]ngravings, paintings, sculptures, furnishings, jewelry, currency, weapons, dress items, machinery, tools and other objects of anthropological and historic interest, manufactured before 1900.

Because the moon rock is not something that was manufactured, but is rather a work of nature, I agree with Professor Rosenn that the 1984 law cannot apply to it. And though the plaque is of course manufactured, there is no evidence that it was manufactured before 1900. Thus, the 1984 law does not apply to the moon rock and plaque.

#### E. The Lunar Rock And Plaque Constitute National Property Of Public Use Under The Civil Code

Title III of Book II of the general provisions of the Honduran Civil Code deals

with national property. Article 617 of the Civil Code provides:

> Art. 617. Property whose dominion belongs to the whole nation is called national property. If its use belongs to all the inhabitants of the nation, such as the streets, plazas, bridges and roads, the adjacent sea and its beaches, it is called national property of public use or public property. National property whose use does not belong generally to the inhabitants is called State property or government property.

Thus, the Honduran Civil Code separates national property into two categories: (1) national property of public use (*bienes nacionales de uso público o bienes públicos*), and (2) state property (*bienes del Estado o bienes fiscales*).

National property of public use consists of property that belongs to the entire country, such as streets, plazas, bridges, and the beaches. This list, however, is not meant to be exclusive, but merely descriptive. *See* REINALDO CRUZ LOPEZ, LOS BIENES: APUNTES DE DERECHO CIVIL 27 (3d ed.1989).[3] This class of property cannot be bought, sold, devised, mortgaged, attached, or otherwise alienated without special legislation passed by the Honduran legislature. Additionally, if such property has been lost or stolen, whoever has possession of it cannot acquire title to it by prescription.

The second category, state property, consists of public property that does not belong to the public in general. This class includes all personal or real property that belongs to the state as if it were a private person, such as trucks, computers, or office buildings.

According to Professor Rosenn, the plaque and moon rock fall into the category of national property of public use because they were a gift by President Nixon to the entire people of Honduras to be shared generally as part of the country's national heritage. Thus, they could not be bought, sold, or otherwise alienated without special legislation, nor could title to them be acquired through prescription. Professor Rosenn, in reaching this conclusion, relied in part on Article 3 of the 1997 Law on Cultural Patrimony, which makes plain that national property of public use includes property that is part of the nation's cultural heritage. Article 4 of the 1997 law also provides that cultural property of public use is under the permanent dominion of the Honduran government, and is inalienable and not subject to acquisition by prescription. After considering the relevant provisions of Honduran law in light of the record evidence, I agree with Professor Rosenn's conclusions.

Professor Rosenn also points out that, even if the plaque and moon rock were considered state property rather than national property of public use, they could not have been sold or transferred to anyone without statutory authorization. This is because of Article 354 of the Honduran Constitution:

> Art. 354. State property (*bienes fiscales*) or patrimonial property may only be adjudicated or alienated to the persons and in the manner and under the conditions determined by law.

Because the Honduran government has enacted no legislation authorizing the alienation of the moon rock or the plaque,

---

3. *See also* HENRY SAINT DAHL, DAHL'S LAW DICTIONARY 41 (3d ed. 1999) ("**Bienes de uso público**. Things of public use. The property of public use comprises the insular and local roads, the squares, streets, fountains and public waters, walks, and public works for general use paid for by the towns or by the state treasury. All other property, possessed by either the state or the municipalities is common property for the use of the general and municipal government and shall be governed by the Civil Code. (Spanish Civ. C., sec. 328).").

I agree with Professor Rosenn that the items could not have been lawfully sold or transferred. *See also* Verified Complaint at ¶ 39 ("The Consul General of ... Honduras has identified the defendant property as patrimony of Honduras and has stated that pursuant to Honduran law the defendant property could not be legally sold, or conveyed, or removed from Honduras unless expressly authorized by action of the National Congress.").

### F. THE TAKING OF THE LUNAR ROCK AND PLAQUE CONSTITUTED LARCENY UNDER THE PENAL CODE

The moon rock and plaque were national property of public use and could not have been sold or alienated. Thus, whoever took them from the Presidential Palace committed the crime of larceny under Honduran law.

Art. 223. Larceny is committed when: (1) Whoever, without the consent of the owner, takes another's movable thing [*i.e.*, personal property], including animals, in order to utilize it, without violence or intimidation of persons or force as to things.
(2) Whoever finds a lost thing and does not deliver it to an authority or to its owner if he knows who it is, and appropriates it with the intent to profit from it.

Given that there is no Honduran legislation authorizing the sale of the moon rock or plaque, Mr. Rosen's best claim is that he acquired them from a person who was either the thief or someone who got them from the thief.

### G. NEITHER MR. ROSEN NOR HIS ASSOCIATES COULD HAVE ACQUIRED GOOD TITLE TO THE MOON ROCK AND PLAQUE UNDER HONDURAN LAW

Given that the moon rock and plaque constitute national property of public use, neither Mr. Rosen nor his associates could have acquired title to them, even by prescription. The reason for this is that under Honduran law the statute of limitations does not run with respect to such property. Article 2669 of the Civil Code provides that "[a]ll things which are in commerce among men are subject to prescription." Because national property of public use cannot be commercialized, the negative implication of this provision is that such property cannot be acquired by prescription.

Even assuming, *arguendo*, that the moon rock and plaque are state property rather than national property of public use, Mr. Rosen still could not have acquired proper title to them. State property can be acquired by prescription, and the applicable period for the running of the statute of limitations depends upon colorability of title and the maximum penalty for larceny. Once the statute of limitations has run on an act of criminal larceny, good title to stolen property can be acquired by prescription. *See* Honduran Civil Code, Art. 2285. The statute of limitations for larceny of property worth more than 5,000 lempiras (about $500) is 14 years. *See* Honduran Penal Code, Arts. 97, 224–25; Honduran Civil Code, Art. 2370(20). Because Mr. Rosen's possession could not have been in good faith, the period for prescription would be an additional six years. *See* Honduran Civil Code, Art. 2284. Accordingly, no one who acquired possession of the moon rock and plaque could acquire good title by prescription until a total of 20 years (or at least 14 years) after the date of the theft. Mr. Rosen obtained the property in 1996, so the theft would have to have occurred prior to 1976 for someone to acquire title by prescription. Because the theft occurred much later—between 1990 and 1994—Mr. Rosen could not have acquired good title of the moon rock and plaque from anyone.

### H. Professor Rosenn's Conclusions

In sum, Professor Rosenn concluded that the moon rock and plaque became inalienable national property of public use of the Republic of Honduras in 1973, as a result of a completed gift by President Nixon. Special legislation was necessary to alienate these items, and no such legislation was enacted. Thus, whoever took the items from the Presidential Palace committed larceny, making the rock and plaque stolen property. I agree with Professor Rosenn's interpretation of Honduran law, and note that Mr. Rosen has not presented any persuasive argument to challenge those conclusions.

Thus, neither Mr. Rosen or any of his Honduran associates could have acquired good title to the moon rock and plaque under Honduran law. Although good title to stolen property can sometimes be acquired by prescription, the statute of limitations does not run against national property of public use. Even assuming that the moon rock and plaque are merely state property, which can be acquired by prescription, good title could not have been acquired unless the items were possessed for 20 years (or at least 14 years). The moon rock and plaque, missing from the Presidential Palace since no earlier than 1990, could not have been lawfully possessed by Mr. Rosen or any of his Honduran associates in the mid–1990s.

The exportation of the moon rock and plaque from Honduras under such circumstances would have been unlawful because they were stolen property. For example, Honduran law makes it a criminal offense "to procure the disappearance of evidence of a crime." Honduran Penal Code, Art. 388. The moon rock and plaque are indeed evidence of a crime, and their exportation to the United States is an act that procures their disappearance as evidence for any Honduran authorities investigating their theft.

### III. Forfeiture Under 19 U.S.C. §§ 1595A(C)(1)(A) & 1615

 The United States seeks forfeiture pursuant to 19 U.S.C. § 1595a( c)(1)(A), which provides that

[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:

(1) The merchandise shall be seized and forfeited if it -

(A) is stolen, smuggled, or clandestinely imported or introduced ...

This statute is procedurally governed by 19 U.S.C. § 1615, which provides in pertinent part that

[i]n all suits or actions ... brought for the forfeiture of any ... merchandise ... seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon such claimant ... *Provided,* that probable cause shall be first shown for the institution of such suit or action, to be judged by the court ...

Thus, once the government establishes probable cause, the burden shifts to the claimant to rebut the probable cause showing or to establish an affirmative defense by a preponderance of the evidence. *See Nnadi,* 976 F.2d at 686; *United States v. A Single Family Residence and Real Property,* 803 F.2d 625, 629 (11th Cir. 1986); *United States v. One 1975 Ford F100 Pick-up Truck,* 558 F.2d 755, 756 (5th Cir.1977); *United States v. One Defender Lobster Vessel Named Betty II,* 606 F.Supp. 32, 36 (S.D.Fla.1984).[4]

---

4. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub.L. No. 106–85, 114 Stat. 202, which altered the procedural framework, evidentiary burdens, and defenses for many federal forfeiture statutes, does not govern here. By its own terms, the CAFRA applies only to proceedings under a "civil

Unlike other forfeiture statutes, § 1595a(c) does not contain a so-called "innocent owner" defense. *See An Antique Platter of Gold*, 991 F.Supp. at 232 ("[§ ] 1595a(c) does not provide for an innocent owner defense"). *See also One 1975 F100 Ford Pick-up Truck*, 558 F.2d at 757 (holding, in case involving forfeiture under 49 U.S.C. § 782 and the former version of § 1595a, that "good faith or innocence on the part of an owner of property subject to forfeiture is immaterial in a seizure under the narcotics laws"). Although many forfeiture statutes now have an innocent owner defense under the CAFRA, *see* 19 U.S.C. § 983(d), the CAFRA does not apply to forfeiture proceedings under § 1595a( c). *See* n. 4 (explaining that the CAFRA does not apply to provisions under Title 19).

### A. MR. ROSEN'S STANDING

▮ The government contends that Mr. Rosen lacks standing because the agreement he presented is not for the purchase of the moon rock and plaque, but instead specifically provides for Mr. Rosen to take possession of the items in order to market them and sell them to a third party. If the sale is not effectuated within 90 days, the items are to be returned to Colonel Argurcia. Mr. Rosen testified to the contrary, however, explaining that he had actually purchased the items. In addition, at the time the items were seized, Mr. Rosen had been in possession of them for a year and a half—well over the 90–day period within which he had to effectuate a sale under the agreement. Accordingly, I find that Mr. Rosen has established by a preponderance of the evidence that he has standing to assert a claim for the items. *See United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir.2001) ("To have stand-

ing to contest a ... forfeiture, a claimant must have an ownership or possessory interest in the property seized.") (internal quotation marks omitted).

### B. PROBABLE CAUSE

▮ Probable cause is defined as a reasonable ground for belief of a fact supported by less than *prima facie* proof, but more than mere suspicion. *See United States v. $242,484.00*, 318 F.3d 1240, 1243 (11th Cir.2003); *A Single Family Residence*, 803 F.2d at 628; *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980). The existence of probable cause is judged not with clinical detachment, but with a common sense view toward real life. *See A Single Family Residence*, 803 F.2d at 628. Additionally, probable cause in a civil forfeiture proceeding may be established by circumstantial or hearsay evidence. *See id.* at 628–29.

▮ An item is "stolen" under federal law when there is a felonious taking with intent to deprive the owner of the rights and benefits of ownership, regardless of whether the taking constitutes larceny at common law. *See United States v. Turley*, 352 U.S. 407, 417, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). Stated differently, "in order for property to be considered 'stolen,' the property must rightfully belong to someone other than the person who has it." *United States v. Portrait of Wally*, 2002 WL 553532, *19 (S.D.N.Y.2002) (*Wally II* ).

The government's evidence amply establishes probable cause that the moon rock and plaque were stolen for purposes of § 1595a( c) and then introduced into the United States.

---

forfeiture statute," and that term does not include "any ... provision of law... codified

in Title 19." *See* 18 U.S.C. § 983(i).

First, Honduras has title to the moon rock and plaque under its law, and it has in no way authorized the transfer of those items, which were a gift to the country from President Nixon in 1973. Honduran law does not allow for the alienation of such items absent some special legislation, and no such legislation has been enacted. And, as explained earlier, it would be impossible under Honduran law for anyone to acquire title to these items through other means such as prescription. To the extent that title prescription were theoretically possible, no such title was acquired because the items were taken from the Presidential Palace between 1990 and 1994. In addition to Professor Rosenn's conclusions about the illegal taking of the items, there is additional evidence that the items were stolen. Most significant is that Colonel Argurcia was "quite anxious" to sell the items (without any papers establishing his ownership) for a mere $50,000 when he had been seeking $1 million just a year earlier. Apparently Colonel Argurcia was having trouble moving items with a questionable provenance. At about the same time, Mr. Rosen estimated the value of the items at $500,000 (and later at $5 million). Although Mr. Rosen still owes $15,000, apparently neither Colonel Argurcia or Mr. Bayardo have demanded return of the items or sued Mr. Rosen for the balance, suggesting that the sale was not a normal arms' length commercial transaction. Furthermore, Mr. Rosen's own web site obscured the Honduran flag and the presentation plaque, suggesting that he knew or believed that the items were illegally obtained. Finally, Mr. Rosen's statements to the undercover agents—that dealings were done under the table or in dark alleys, that possession of lunar material was illegal, and that he was concerned

that the agents might be working for the federal government and be trying to seize the items—show that he knew (or at least suspected) that he did not have lawful possession of the items. *See, e.g., United States v. McClain*, 545 F.2d 988, 1003 n. 33 (5th Cir.) (*McClain I*) ("illegal exportation constitutes a sufficient act of conversion to be deemed a theft"), *on rehearing*, 551 F.2d 52 (5th Cir.1977).[5]

Second, it is uncontested that the moon rock and plaque were introduced into the United States. The items were delivered to Honduras in 1973, and Mr. Rosen took possession of the items in Miami more than two decades later.

Accordingly, the United States has met its burden of showing probable cause under §§ 1595a( c) and 1615. In order to prevail, Mr. Rosen must therefore present evidence sufficient to rebut the government's probable cause showing by a preponderance of the evidence. *See United States v.1948 S. Martin Luther King Dr.*, 270 F.3d 1102, 1114 (7th Cir.2001) (holding that self-serving assertions, unsupported by records or witnesses, are insufficient to rebut a showing of probable cause); *United States v. Parcels of Property*, 9 F.3d 1000, 1005 (1st Cir.1993) ("[D]enials alone, unaccompanied by offers of proof, [are] insufficient to rebut a showing of probable cause."). Mr. Rosen has failed to do so.

### C. MR. ROSEN'S EVIDENCE AND ARGUMENTS

Mr. Rosen initially contends that Professor Rosenn's report is flawed because it was based in part on the incorrect assumption that Mr. Rosen did not have a bill of sale. Mr. Rosen has in fact produced a document—the assignment agreement—which he says became a bill of sale from

---

**5.** Given Mr. Rosen's statements and the circumstances surrounding his acquisition of the moon rock and plaque, I would reject an innocent owner defense even if it were available. Mr. Rosen is not a bona fide purchaser for value, and knew (or reasonably had cause to believe) that the items were subject to forfeiture. *See* 18 U.S.C. § 983(d)(3)(A).

Colonel Argurcia for the moon rock and plaque. Nevertheless, his argument is flawed. The fact that Mr. Rosen was in possession of a bill of sale does not alter Professor Rosenn's conclusion or my determination of Honduran law. The only way the items at issue could be alienated would be by authorization of the Honduran government through special legislation, and no such legislation exists. In any event, the bill of sale does little to establish that Colonel Argurcia was lawfully in possession of the items when he sold them to Mr. Rosen.

■ Next, Mr. Rosen faults Professor Rosenn's classification of the moon rock and plaque as national property of public use under Honduran law. He notes that the Civil Code's exemplars of this type of property are streets, bridges, plazas, beaches, and the adjacent sea. Mr. Rosen contends that I should apply American statutory construction principles to this Honduran provision and exclude the items from its scope. *See, e.g., Beecham v. United States*, 511 U.S. 368, 371, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994) ("That several items in a list share a common attribute counsels in favor of interpreting the other items as possessing that attribute as well."). He then argues that the essential characteristics of national property of public use are real property used by the public at large. Because the moon rock and plaque are not real property, he continues, they do not fall within this category. His argument fails for two reasons.

First, Article 617 of the Civil Code provides that national property of public use is property that "belongs to all the inhabitants of the nation." Although Article 617 cites the examples mentioned by Mr. Rosen, Honduran authority (cited by Professor Rosenn) indicates that the list is merely descriptive, and not all-inclusive, *see* REINALDO CRUZ LOPEZ, LOS BIENES: APUNTES DE DERECHO CIVIL 27 (3d ed.1989), so there is no basis for importing American principles of statutory construction into the analysis. The moon rock and plaque were a gift from the United States to the people of Honduras, as evidenced by the inscription on the plaque, which reads that the items were "[p]resented to the people of the Republic of Honduras from the people of the United States of America." The gift was intended for the use of all the inhabitants of Honduras, and its lack of real property characteristics, therefore, does not exempt it from inclusion in the category of national property of public use.

■ Second, even assuming that the moon rock and plaque are not considered national property of public use, Mr. Rosen still fails to rebut the government's showing of probable cause. Article 617 of the Civil Code provides that "[n]ational property whose use does not belong generally to the inhabitants is called State property." If the moon rock and plaque are not national property of public use, they are state property. Like national property of public use, state property also may not be alienated absent special legislation. And although state property may be acquired by prescription, the earlier discussion of Honduran law indicates that to do so in this case would take 20 years (or at least 14 years). The moon rock and plaque have been missing from the Presidential Palace for, at most, 12 years.

In a related argument, Mr. Rosen contends that the United States has failed to show that the Republic of Honduras owned the moon rock and plaque. The lone authority he cites in support of his position is *Government of Peru v. Johnson*, 720 F.Supp. 810 (C.D.Cal.1989). In *Johnson*, the district court concluded that the government of Peru could not establish that it was the legal owner of certain artifacts seized by the United States government. *See id.* at 815. The court reached this

decision based on several factors. First, the court could not determine in what country the artifacts were found. Second, it could not determine when they were found. Third, it had no way of knowing whether the artifacts were the possessions of a private person. Fourth, Peru's claim of ownership was not supported by its domestic law. *See id.* In my view, *Johnson* is distinguishable because it does not appear to involve forfeiture under 19 U.S.C. § 1595a( c)—it is unclear from the opinion what substantive law governed or was applied—and because all of the factors identified by the district court in that case are absent here.

Mr. Rosen further suggests, citing *United States v. McClain*, 593 F.2d 658 (5th Cir.1979) (*McLain II* ), that the application of ambiguous foreign law in this civil forfeiture proceeding is prejudicial to him. In that opinion, the Fifth Circuit held that, in a criminal prosecution under 18 U.S.C. § 2314, it is error to permit the jury to interpret and decide issues of foreign law. *See id.* at 667–70. This case, however, is a civil forfeiture proceeding (with a probable cause standard and no jury), and not a criminal prosecution (which requires proof beyond a reasonable doubt). But even if the concerns articulated in *McClain II* were relevant here, there is no ambiguity about Honduran law.

Focusing on the fact that admiralty rules sometimes govern civil *in rem* forfeiture proceedings, Mr. Rosen next requests that I allow for an equitable division of the items so that the competing claims—his and those of the United States and/or Honduras—can be satisfied. Although Mr. Rosen does cite authority indicating that courts have some equitable powers in a forfeiture cases, *see One Single Family Residence,* 932 F.2d 1433, 1434 (11th Cir. 1991) (forfeited house was sold at an interlocutory auction pursuant to a stipulation between the parties), the facts of this case do not indicate that any such equitable division is justified. Mr. Rosen also relies on *United States v. One 20 Dollar 1933 Double Eagle,* Case No. 96–2527–AKH (S.D.N.Y.), where the subject property was sold at a Sotheby's auction and the proceeds were divided between the claimant and the government. Although Mr. Rosen suggests that Judge Hallerstein ordered the property sold at an auction in that case,[6] a telephone conversation with Judge Hallerstein reveals that the parties in the *Double Eagle* case agreed to such a disposition and entered into a stipulation to that regard. Judge Hallerstein therefore never ordered any equitable division. Accordingly, in both cases where an equitable apportionment occurred, it was because the parties agreed to it. In this case, the United States has not agreed to an equitable division, and indeed, vehemently opposes it.

In sum, Mr. Rosen has failed to rebut the government's showing of probable cause by a preponderance of the evidence. Accordingly, the United States is entitled to judgment in its favor.

## IV. CONCLUSION

The moon rock and plaque are forfeited to the United States under 19 U.S.C. §§ 1595a( c) and 1615. A final judgment will be issued separately.

---

**6.** Mr. Rosen indicated that he was unable to procure more information relating to the *Double Eagle* case because the decision was unpublished.