UNITED STATES of America, Plaintiff–Appellee,

v.

Sharyl R. DAVIS, Claimant–Appellant,

The Painting Known as "Le Marché," created by Camille Pissarro, located at Sotheby's, 1334 York Avenue, New York, NY, Defendant–in–Rem.*

Docket No. 10–300–cv.

United States Court of Appeals, Second Circuit.

Argued: Feb. 2, 2011.

Decided: June 3, 2011.

---

* The Clerk of Court is respectfully instructed to amend the official caption in this case to conform to the listing of the parties above.

Barbara Hoffman, The Hoffman Law Firm, New York, NY, for Claimant–Appellant.

Jeffrey Alberts, Assistant United States Attorney (Virginia Chavez Romano, Assistant United States Attorney, on the brief), for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, for Plaintiff–Appellee.

Before: CALABRESI and LYNCH, Circuit Judges, and COTE, District Judge.**

GERARD E. LYNCH, Circuit Judge:

This case involves two parties, both asserting legitimate claims to the same indivisible piece of property. In 1985, claimant-appellant Sharyl R. Davis purchased the Camille Pissarro monotype *Le Marché* for its fair market value, unaware that it had recently been stolen from a French museum. More than twenty years later, *Le Marché's* true provenance came to light, and the United States government brought this forfeiture action with the intent of returning the monotype to France. Unlike in the Judgment of Solomon, *see* 1 Kings 3:16–28, neither party has blinked, and we are therefore in the unenviable position of determining who gets the artwork, and who will be left with nothing despite a plausible claim of being unfairly required to bear the loss. In making that determination, we take comfort in our obligation to follow the rules that Congress has given, and recognize that justice is done by providing the predictable result that Congress intended. Doing so here requires that we affirm both the district court's (Sullivan, *J.*) final judgment of forfeiture entered on January 19, 2010, and its order of May 25, 2010, denying Davis's motion for attorney's fees.

---

** The Honorable Denise Cote, United States District Judge for the Southern District of New York, sitting by designation.

## BACKGROUND

### I. *Factual Background*

Two works of art were stolen from the Musée Faure in Aix–les–Bains, France on November 16, 1981. One of them, the Pissarro monotype *Le Marché*, made its way to San Antonio, Texas, where Emil Guelton consigned it to J. Adelman Antiques and Art Gallery. On May 1, 1985, the gallery's proprietor, Jay Adelman, sold the monotype for $8,500 to the Sharan Corporation, a now-defunct entity once partially controlled by Davis.

Following the Sharan Corporation's 1992 dissolution, Davis took ownership of *Le Marché*, which she displayed in her home for more than ten years before consigning it to Sotheby's for sale at an upcoming auction. The French National Police became aware of *Le Marché's* impending sale and informed United States law enforcement officials that the Pissarro monotype soon to be auctioned off by Sotheby's had been stolen from the Musée Faure twenty-two years earlier. The United States Department of Homeland Security requested that Sotheby's withdraw *Le Marché* from the auction, and Sotheby's complied.

Around the same time, the French authorities reopened their investigation into the theft in hopes of uncovering sufficient evidence to secure *Le Marché's* return. As part of those efforts, investigators interviewed Guelton, who admitted selling artwork to Adelman while visiting Texas in the 1980s. Investigators also included Guelton's picture in a photo array that they showed to Jacqueline Rivollet, the museum guard on duty the day of the theft. Rivollet positively identified Guelton as the thief. Armed with this evidence, the United States government filed a verified complaint in the Southern District of New York on November 6, 2006, seeking civil forfeiture of the monotype.

### II. *District Court Proceedings*

The government's complaint alleged three separate claims for forfeiture. First, the government's "customs claim" sought forfeiture under 19 U.S.C. § 1595a, a customs statute enacted as part of the Tariff Act of 1930. Section 1595a authorizes the forfeiture of "[m]erchandise which is introduced ... into the United States contrary to law ... if [the merchandise] ... is stolen, smuggled, or clandestinely imported or introduced." 19 U.S.C. § 1595a(c)(1)(A). To satisfy the statute's "contrary to law" requirement, the government alleged a violation of the National Stolen Property Act ("NSPA"), which criminalizes, among other things, the possession or sale of stolen goods valued at $5,000 or more that have moved in interstate or international commerce, with knowledge that the goods were stolen. *See* 18 U.S.C. §§ 2314, 2315. To satisfy the "is stolen, smuggled, or clandestinely imported or introduced" requirement, the government alleged that Guelton took *Le Marché* from the Musée Faure.

The government based its second and third forfeiture claims on 18 U.S.C. § 981, under which property constituting or "derived from proceeds traceable to a violation of ... any offense constituting 'specified unlawful activity' " is forfeitable to the United States. 18 U.S.C. § 981(a)(1)(C). Because NSPA violations are "specified unlawful activity," *see* 18 U.S.C. §§ 1956(c)(7)(A), 1961(1), the government asserted the same factual predicate to support its forfeiture claims under Section 981 as it did to support its customs claim, namely that *Le Marché* constituted the proceeds of Guelton's theft.

Following discovery, the government moved for summary judgment on its customs claim. Davis responded by filing a cross-motion for summary judgment on all

three of the government's forfeiture claims in which she asserted that her status as an "innocent owner" of *Le Marché* entitled her to continued possession of the monotype. In support of that proposition, Davis directed the district court to 18 U.S.C. § 983(d), which provides that "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute."

At a hearing on June 17, 2009, the district court ruled on several issues relevant to the government's customs claim. First, it found that forfeiture actions brought pursuant to 19 U.S.C. § 1595a are not subject to an innocent-owner defense. Second, it concluded that the burden-shifting approach found in 19 U.S.C. § 1615[1] applied, and therefore the initial burden rested on the government to demonstrate probable cause to believe that *Le Marché* was subject to forfeiture. Third, the district court found—based on Rivollet's eyewitness identification of Guelton and the undisputed fact that Guelton had sold the monotype to Adelman while in Texas—that the government had made a showing of probable cause for forfeiture. The burden therefore shifted to Davis to establish by a preponderance of the evidence that the monotype was not stolen merchandise introduced into the United States contrary to law. *See* 19 U.S.C. §§ 1595a(c), 1615.

As for the government's forfeiture claims under 18 U.S.C. § 981, the district court found that Davis had established that she was an innocent owner of the monotype within the meaning of 18 U.S.C.

§ 981(d)(3)(A), and was therefore entitled to summary judgment on those claims. The government has not appealed that ruling.

In January 2010, the district court held a jury trial to resolve the two remaining disputed issues of material fact: whether Davis could demonstrate by a preponderance of the evidence that *Le Marché* "(1) was not transported in interstate or foreign commerce; (2) with knowledge that the property was stolen."[2] At trial, Davis called Rivollet to the stand. She testified to being a mere "meter and a half" from Guelton on the day of the theft and to looking him in the eyes as he entered the museum. On cross examination, Rivollet explained that she later heard Guelton running down the stairs, and then saw him emerge from the stairwell "with something under [his] parka." After calling the police, Rivollet inventoried the museum's collection and discovered that *Le Marché* had been removed from its spot on the wall. Additional evidence demonstrated that Guelton later transported *Le Marché* into the United States and consigned it to Adelman.

Jury deliberations began the morning of January 11, 2010. Later that day, the jury returned a unanimous verdict for the government. Specifically, the jury found that Davis had failed to prove (1) that *Le Marché* was "not the work of art stolen from the Faure Museum" on November 16, 1981, (2) that *Le Marché* "was not transported, transmitted or transferred in

[1]. 19 U.S.C. § 1615 provides:

In all suits or actions ... brought for the forfeiture of any vessel, vehicle, aircraft, merchandise, or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon such claimant ... *Provided,* That probable cause shall be first shown for the institution of such

suit or action, to be judged of by the court. ...

[2]. The district court had previously concluded that there was no dispute regarding the value of *Le Marché* at the time of its introduction into the United States, and it therefore granted summary judgment to the government on that element of its customs claim.

interstate or foreign commerce" by Guelton, or (3) that "Guelton did not receive, possess, conceal, store, barter, sell, or dispose of [*Le Marché*], knowing it was stolen, after [*Le Marché*] crossed a United States or state border." On January 19, 2010, the district court entered a final judgment of forfeiture, and on May 25, 2010, it denied Davis's motion for attorney's fees. This appeal followed.

## DISCUSSION

■ On appeal, Davis brings a host of challenges to the proceedings below. We begin by addressing Davis's argument that the government failed to demonstrate probable cause to believe that *Le Marché* was subject to forfeiture under 19 U.S.C. § 1595a. Next, we turn to Davis's argument that she was entitled to additional substantive and procedural protections that the district court found inapplicable to forfeiture actions brought pursuant to 19 U.S.C. § 1595a. We then resolve Davis's constitutional challenges, before finally addressing the issue of attorney's fees.

## I. *19 U.S.C. § 1595a and the National Stolen Property Act*

Section 1595a authorizes the forfeiture of merchandise "introduced into the United States contrary to law," if that property "is stolen, smuggled, or clandestinely imported or introduced." 19 U.S.C. § 1595a(c)(1)(A). To satisfy the statute's "contrary to law" requirement, the government alleged that Guelton violated the NSPA by stealing *Le Marché* from the Musée Faure, transporting it into the United States, and then consigning it to Adelman. *See* 18 U.S.C. §§ 2314, 2315. Davis submits that the district court committed three errors in its application of the NSPA to this case. First, Davis argues that "contrary to law" refers only to violations of the customs laws, not to violations

of the NSPA. Davis also argues that the district court erred in granting summary judgment to the government on whether *Le Marché's* value met the NSPA's statutory minimum of $5,000. Finally, Davis argues that *Le Marché* is no longer "stolen" property within the meaning of Section 1595a(c), and is therefore not subject to forfeiture. We address those arguments in turn.

### A. *The Meaning of "Contrary to Law"*

Property is subject to forfeiture under 19 U.S.C. § 1595a(c) only if it is introduced into the United States "contrary to law." Davis argues that NSPA violations "cannot serve as a predicate offense to effect seizure under § 1595a(c)'s 'contrary to law' [requirement] without a customs violation." In effect, she urges us to read the phrase "contrary to law" as "contrary to customs law."

■ "It is axiomatic that the plain meaning of a statute controls its interpretation." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir.1999). The phrase "contrary to law" means "illegal; unlawful; conflicting with established law." *See* Black's Law Dictionary 377 (9th ed.2009). Nothing in the text of Section 1595a limits that broad definition, and nowhere does the statute narrowly define the word "law."

The government argues, with some force, for a literal interpretation of the statute. If Congress had intended to limit the scope of Section 1595a to violations of the customs laws, it could have said so. Since it did not, Section 1595a(c) would appear to require only that the property in question be introduced into the United States illegally, unlawfully, or in a manner conflicting with established law.

The rest of the statute provides additional support for this interpretation. For

example, Section 1595a(c)(2)(C) permits the forfeiture of "merchandise or packaging in which copyright ... violations are involved," *see* 17 U.S.C. § 506, while Section 1595a(c)(2)(D) permits the forfeiture of "trade dress merchandise involved in the violation of a court order [pursuant to 15 U.S.C. § 1125]." That Section 1595a incorporates by reference federal laws that do not directly pertain to customs enforcement counsels against a reading of "contrary to law" that might preclude its application to those very statutes. Accordingly, there is a strong argument that the phrase "contrary to law" in Section 1595a(c) means exactly what it says: the government may seize and forfeit merchandise that is introduced into the United States illegally, unlawfully, or in a manner conflicting with established law, regardless of whether the law violated relates to customs enforcement.

On the other hand, a statute's context is critical to its interpretation and Section 1595a's reference to the importation of goods is relevant to discerning what Congress intended by the phrase "contrary to law." 19 U.S.C. § 1595a(c). In light of this context, it can be argued that some nexus between international commerce—the subject of the customs regulations found in Title 19—and the law violated is necessary to trigger Section 1595a's remedies.

We need not resolve that issue in this case because, even if such a nexus is required, the NSPA provides one. It requires the "transport[ation], transmi[ssion], or transfer[ ]" in interstate or foreign commerce" of stolen property or the dealing in stolen property that has "crossed a State or United States boundary." 18 U.S.C. §§ 2314, 2315. Whatever the merit of the government's argument that the violation of *any* law suffices to meet Section 1595a's requirement that an

object's introduction be "contrary to law," violation of the NSPA certainly does suffice, and as that is the only law the government has alleged as a basis for its invocation of Section 1595a, that is the only question we need answer here.

## B. *The Value of* Le Marché

■ Davis submits that, even if NSPA violations satisfy the "contrary to law" requirement of Section 1595a, the district court improperly granted summary judgment for the government on whether *Le Marché's* value at the time it entered the United States met the $5,000 threshold necessary for an NSPA violation. We review de novo the district court's grant of summary judgment, applying the same standard as the district court to determine whether "a genuine issue of a material fact exists that would preclude judgment as a matter of law." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir.1994). Here, Davis's evidence failed to raise a material issue of fact regarding *Le Marché's* value, and so the district court properly granted summary judgment to the government.

At summary judgment, the undisputed evidence before the district court indicated that *Le Marché* was stolen on November 16, 1981, and that Adelman sold it to the Sharan Corporation for $8,500 on May 1, 1985. That soon after its importation *Le Marché* sold for a price seventy percent above the statutory minimum is strong evidence that it was valued at or above $5,000 at the time Guelton brought it into the United States. Therefore, in order to avoid summary judgment on this issue, Davis needed to come forward with some evidence tending to show that *Le Marché* was worth less than $5,000 at the time of importation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (genuine

issues of material fact exist if "a reasonable [factfinder] could return a verdict for the nonmoving party"). This she failed to do.

Davis's Local Rule 56.1 statement cites five pieces of evidence that she argues raise a genuine issue of material fact regarding *Le Marché's* value. The first is a declaration by expert appraiser Alex Rosenberg—evidently directed to whether Davis is an innocent owner—stating that "$8,500 was not an unreasonably low price for the Monotype," and that a sale price within that range should not "trigger a suspicion that the work of art was stolen." This statement is hardly evidence that *Le Marché* was worth *less* than $8,500; the only reasonable inference that can be drawn from it is that the price Sharan Corporation paid for the monotype in 1985 approximated its fair market value, or, if anything, was too low (albeit not "unreasonably low"). The second is a declaration from art expert Gilbert Edelson explaining that "several hundreds of thousands of prints are sold annually in the [United] States. Although a very small number of important, well-known rarer prints by artists such as Rembrandt will sell for substantial prices, the overwhelming number of prints sell for less than $5,000." However, Edelson's declaration is wholly silent on the value of *Le Marché*, and does not indicate whether or not it falls into the category of "well-known rarer prints" that command a premium price. It therefore does nothing to undermine the government's evidence that *Le Marché* was worth more than $5,000 during the relevant period. Similarly, not one of the depositions that Davis cites—from the curator of the Musée Faure, from a federal agent who

investigated this case, and from Adelman—sheds any light on *Le Marché's* value.

A jury presented with both the uncontradicted evidence that *Le Marché* was worth $8,500 in 1985 and the equivocal and irrelevant statements cited by Davis could not reasonably conclude that the monotype was worth less than $5,000 when it entered the United States. We therefore affirm the district court's finding that the government was entitled to summary judgment on that element of its forfeiture claim.

### C. The Meaning of "Is Stolen"

Property "shall be seized and forfeited" pursuant to 19 U.S.C. § 1595a(c)(1)(A) if it "is stolen, smuggled, or clandestinely imported or introduced" into the United States. Davis submits that the word "is" requires us to assess whether *Le Marché* constituted stolen property at the time of forfeiture, rather than at the time it entered the United States.[3] That argument, which calls for an interpretation of the statute that conflicts with the most natural reading of the text, is without merit.

██ The text of the statute makes clear that "is stolen" refers to the status of the property at the time of its introduction into the United States. The relevant portion of Section 1595a(c) states:

Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:

(1) The merchandise shall be seized and forfeited if it—

(A) is stolen, smuggled, or clandestinely imported or introduced; . . .

---

**3.** Davis then proceeds to contend that she had acquired title to the work under Texas law by the time of forfeiture, such that it could no longer be considered "stolen." Because we

find that the phrase "is stolen" refers to the property's status at the time of introduction, we need not address that argument.

(D) is a plastic explosive, as defined in section 841(q) of Title 18, which does not contain a detection agent, as defined in section 841(p) of such title....

Subsection (c) applies only to "[m]erchandise which is introduced or attempted to be introduced into the United States," and it therefore unquestionably focuses on the manner in which the merchandise enters the United States. Under the most natural reading of the text, the phrase "is stolen," which modifies the same merchandise, also refers to the merchandise's status at the time of introduction. That focus makes sense: Section 1595a is a customs statute regulating the flow of goods into and out of the country. It is therefore concerned with what types of goods enter the United States, not with what happens to them after they get here.

Davis's interpretation shifts the statute's focus away from the border in a manner that would produce absurd results. There is no reason to believe that the word "is" in Section 1595a(c)(1)(A) refers to a different time period than the word "is" in Section 1595a(c)(1)(D), which requires the forfeiture of merchandise that "is a plastic explosive, ... which does not contain a detection agent." *See Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1030 (2d Cir.1990) (noting that "the same word or phrase" should be "construed to have the same meaning" throughout a statute). However, interpreting "is" to refer to the time of forfeiture, rather than the time of importation, would mean that the forfeiture of plastic explosives under Section 1595a(c)(1)(D) could be thwarted if after importation a detection agent were added to the mixture. There is nothing to suggest that Congress intended to create such a loophole when enacting this legislation.

Accordingly, we reject Davis's reading of "is stolen," and adopt instead the more

natural reading of the text that gives full force to each word that Congress employed: the phrase "is stolen" in 19 U.S.C. § 1595a(c) refers to the status of the property at the time of its introduction into the United States.

## II. *The Effect of the Civil Asset Forfeiture Reform Act of 2000 on 19 U.S.C. § 1595a*

Civil in rem forfeiture proceedings are based in part on the "legal fiction" that "[i]t is the property which is proceeded against, and ... held guilty and condemned as though it were conscious instead of inanimate and insentient." *Various Items of Personal Property v. United States*, 282 U.S. 577, 581, 51 S.Ct. 282, 75 L.Ed. 558 (1931). As a result, civil forfeiture claimants are rarely afforded the same procedural and substantive protections applicable in criminal forfeiture proceedings. For example, in many cases the burden rests on the claimant to demonstrate that her property is not subject to forfeiture. *See United States v. Parcel of Property*, 337 F.3d 225, 229–30 (2d Cir. 2003). Similarly, the claimant's culpability is often irrelevant: "a long and unbroken line of cases holds that an owner's interest in property may be forfeited by reason of the use to which the property is put even though the owner did not know that it was put to such use." *Bennis v. Michigan*, 516 U.S. 442, 446, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996); *see also United States v. Ursery*, 518 U.S. 267, 291–92, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996).

Congress responded to concerns regarding the broad scope of the government's civil forfeiture authority by passing the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub.L. No. 106–185, 114 Stat. 202. CAFRA provides some claimants with, among other things, a more favorable burden of proof and an innocent-

owner defense. *See* 18 U.S.C. §§ 983(c) & (d). Davis challenges the district court's finding that those protections are inapplicable to forfeiture actions brought pursuant to 19 U.S.C. § 1595a. We review this question of statutory interpretation de novo. *L–3 Commc'ns Corp. v. OSI Sys., Inc.,* 607 F.3d 24, 27 (2d Cir.2010).

## A. Innocent–Owner Defense

■ Davis submits that forfeiture actions brought pursuant to Section 1595a are subject to an innocent-owner defense. Although that argument has some equitable appeal, it lacks legal merit: 19 U.S.C. § 1595a does not provide for an innocent-owner defense, and CAFRA expressly excludes forfeiture actions brought under Title 19 from its innocent-owner provision.

We turn first to the text of 19 U.S.C. § 1595a. Although "numerous statutes contain an explicit innocent owner defense," *United States v. An Antique Platter of Gold,* 184 F.3d 131, 138 (2d Cir. 1999), Section 1595a plainly does not, nor did Congress provide for one's incorporation by reference to other provisions of the Code. Instead, Section 1595a commands that property "which is introduced or attempted to be introduced into the United States contrary to law ... *shall* be seized and forfeited." 19 U.S.C. § 1595a(c)(1) (emphasis added). The word "shall" indicates that Congress intended forfeiture under Section 1595a(c)(2) to happen as a matter of course. Such definite language is not susceptible to an interpretation that a legitimate possessory interest in the property might defeat an otherwise valid forfeiture claim.

It is unsurprising that Section 1595a—a statute first enacted more than eighty years ago as part of the Tariff Act of 1930,

Pub.L. No. 71–361, 46 Stat. 590—would require forfeiture of property regardless of the owner's culpability. "[E]arly statutes used to enforce the customs laws ... generally ... contained no innocent owner defense." *United States v. 92 Buena Vista Ave.,* 507 U.S. 111, 122, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993); *see also United States v. Bajakajian,* 524 U.S. 321, 330, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) ("Historically, ... the owner of forfeited property could be entirely innocent of any crime."). Indeed, the Supreme Court held, in a case addressing another provision of the Tariff Act of 1930, that "forfeiture may be enforced even against innocent owners.... The penalty is at times a hard one, but it is imposed by the statute in terms too clear to be misread." *General Motors Acceptance Corp. v. United States,* 286 U.S. 49, 57, 52 S.Ct. 468, 76 L.Ed. 971 (1932). Coming so shortly after the statute's adoption, the Supreme Court's decision in that case casts particularly vivid light on the then-prevailing understanding of the Tariff Act's forfeiture provisions, and thus on Congress's likely intent.

Nothing that Congress has done in the subsequent eighty years commands a different result today. *See United States v. An Antique Platter of Gold,* 991 F.Supp. 222, 232 (S.D.N.Y.1997) ("Section 1595a(c) does not provide for an innocent owner defense."), *aff'd,* 184 F.3d 131 (2d Cir. 1999). In fact, subsequent amendments to Section 1595a have introduced no reference to an innocent-owner defense. *See, e.g.,* USA Patriot Improvement and Reauthorization Act of 2005, Pub.L. No. 109–177, 120 Stat. 192, 242; Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 3123, 100 Stat. 3207, 3207–87.[4] Given Con-

---

4. Notably, these cited amendments bracket Congress's extension of the innocent-owner defense to other statutes in 2000.

gress's recent attention to civil forfeiture, "there is no reason to believe that the omission ... was anything but deliberate." *Platter of Gold*, 184 F.3d at 138–39.

Nevertheless, Davis suggests that we graft onto 19 U.S.C. § 1595a the innocent-owner defense that Congress enacted as part of CAFRA.[5] That provision applies to "any civil forfeiture statute," 18 U.S.C. § 983(d)(1), which CAFRA initially defines to include "any provision of Federal law providing for the forfeiture of property other than as a sentence imposed upon conviction of a criminal offense," *id.* § 983(i)(1). However, in what has become known as the "customs carve-out," 18 U.S.C. § 983(i)(2)(A) excludes from that definition "the Tariff Act of 1930 or any other provision of law codified in title 19." That language could not be more clear: for purposes of CAFRA, the Tariff Act of 1930 and the statutory provisions contained in Title 19—including 19 U.S.C. § 1595a—are not "civil forfeiture statutes." Because CAFRA's innocent-owner provision applies only to forfeiture actions brought "under any civil forfeiture statute," and because Section 1595a is not a "civil forfeiture statute" as defined in CAFRA, forfeiture actions brought pursuant to 19 U.S.C. § 1595a are not subject to CAFRA's innocent-owner provision.[6]

■ Undeterred, Davis points to a number of statements in the congressional rec-

ord that may indicate that some members of Congress had hoped for a more comprehensive piece of legislation. Based on those comments, Davis argues that "Congress intended [CAFRA's] innocent owner defense to apply to all federal forfeiture statutes," and urges us to carry out that intent by effectively eliminating the customs carve-out. However, as Davis herself admits, CAFRA's backers ultimately decided to exclude Title 19 from the scope of CAFRA's reforms in order to prevent the bill from being "bottled up in the unsympathetic House Ways and Means Committee, which has jurisdiction over bills affecting Customs." David B. Smith, *An Insider's View of the Civil Asset Forfeiture Reform Act of 2000*, Champion, June 2000, at 29 n. 10. Although Davis characterizes that decision as a reflection of "the arbitrary division of authority between committees in the House[,] not a judgment that there is something special about the forfeiture statutes in Title[ ] 19," we must apply the law that Congress actually passed and that the President signed, not the one that some members of Congress may have preferred. That proponents of a broader law sacrificed their objective in order to secure faster or more certain passage does not undermine, but rather confirms, the status of the final text as the law that represents the enacted wishes of the legislators. Ignoring the customs

**5.** 18 U.S.C. § 983(d) reads in part:

(1) An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.

(2)(A) With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who—

(i) did not know of the conduct giving rise to forfeiture; or

(ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

**6.** *Accord United States v. Painting Known as "Hannibal"*, No. 08 Civ. 1511, 2010 WL 2102484, at *4 (S.D.N.Y. May 18, 2010); *United States v. Approximately 1,170 Carats of Rough Diamonds*, No. 05–CV–5816, 2008 WL 2884387, at *9 (E.D.N.Y. July 23, 2008); *United States v. One Lucite Ball Containing Lunar Material*, 252 F.Supp.2d 1367, 1378 (S.D.Fla.2003).

carve-out would violate our obligation to follow the law rather than make it.

Davis also submits that, because CAFRA's innocent owner provision applies to claims brought under "*any* civil forfeiture statute," 18 U.S.C. § 983(d)(1) (emphasis added), rather than "*a* civil forfeiture statute," *e.g., id.* § 983(a)(1)(A)(i) (emphasis added), it must apply to all statutes authorizing civil forfeiture regardless of how "civil forfeiture statute" is defined in Section 983(i). However, under that interpretation, the phrase "civil forfeiture statute" would mean one thing in Section 983(d), and another elsewhere in the same Section. Such an interpretation is disfavored. *See Clark v. Martinez,* 543 U.S. 371, 378, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). Moreover, when Congress did intend its reform measures to stretch beyond the reach of 18 U.S.C. § 983(i), it used language manifesting that intent, carefully avoiding the "civil forfeiture statute" phrase that it had specifically defined as a term of art with a meaning narrower than its more natural purport. For example, CAFRA's fee-shifting provision applies to "any civil proceeding to forfeit property under any provision of Federal law." 28 U.S.C. § 2465(b)(1). Congress's decision not to use the same broad language in

providing for an innocent-owner defense as it did in defining the scope of CAFRA's fee-shifting provision further supports our conclusion that Congress limited the application of that defense to "civil forfeiture statutes" as that term is defined in Section 983(i).

The statutory language is unambiguous: 19 U.S.C. § 1595(c) does not contain an innocent-owner defense, and the customs carve-out excludes the government's customs claim from the scope of 18 U.S.C. § 983(d). We therefore hold that no innocent-owner defense applies to forfeiture claims brought pursuant to 19 U.S.C. § 1595a.

### B. *Burden of Proof*

■ Davis argues that the district court erred in applying the burden-of-proof approach found in 19 U.S.C. § 1615, rather than the more claimant-friendly approach laid out in 18 U.S.C. § 983(c).[7] We disagree.

There can be no doubt that, prior to CAFRA, the burden-of-proof provision in 19 U.S.C. § 1615 governed forfeiture actions brought pursuant to 19 U.S.C. § 1595a.[8] That result was required by 19

---

7. 18 U.S.C. § 983(c) provides:
 In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property—
 (1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;
 (2) the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture; and
 (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial con-

nection between the property and the offense.

8. *See Nnadi v. Richter,* 976 F.2d 682, 686 (11th Cir.1992) (applying 19 U.S.C. § 1615 to a forfeiture action under Section 1595a); *United States v. $37,780 in U.S. Currency,* 920 F.2d 159, 162 (2d Cir.1990) (stating that 19 U.S.C. § 1615 governs forfeiture under the customs laws); *United States v. Little Al,* 712 F.2d 133, 136 & n. 2 (5th Cir.1983) ("The district court ordered the forfeiture under ... 19 U.S.C. § 1595a[, under which] a showing of probable cause ... shifts the burden-of-proof."); *Hannibal,* 2010 WL 2102484, at *3 (citing Section 1615 for the proposition that, in forfeiture actions brought pursuant to Section 1595a, the claimant bears the ultimate burden of "proving that the property is not in

U.S.C. § 1600, which states that "[t]he procedures set forth in sections 1602 through 1619 of this title shall apply to seizures of any property effected by customs officers under any law enforced or administered by the Customs Service unless such law specifies different procedures." In this case, *Le Marché* was seized by United States Immigration and Customs Enforcement officers acting pursuant to their authority under 19 U.S.C. §§ 1595 and 1595a, statutes which do not specify their own burden-of-proof standard. Therefore, the burden of proof set forth in 19 U.S.C. § 1615 applies.

That result is unaffected by CAFRA because its burden-of-proof provision applies only to forfeiture actions "brought under any civil forfeiture statute." 18 U.S.C. § 983(d)(c)(1). As explained above, Section 1595a is not a "civil forfeiture statute" for purposes of CAFRA, *see* 18 U.S.C. § 983(i), and therefore CAFRA's burden-of-proof provision is inapplicable to the government's customs claim. We therefore find that the district court correctly applied the pre-CAFRA burden-shifting approach of 19 U.S.C. § 1615 to this case.

III. *The Constitutionality of the Forfeiture*

 Davis argues that *Le Marché's* forfeiture violated both the Excessive Fines Clause of the Eighth Amendment and the Takings Clause of the Fifth Amendment. We address those issues in turn, accepting the district court's findings of fact unless clearly erroneous and reviewing de novo the application of those facts to the constitutional standard. *See Bajakajian*, 524 U.S. at 336 n. 10, 118 S.Ct. 2028.

A. *The Excessive Fines Clause*

 The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed." U.S. Const. amend. VIII. A fine refers to "a payment to a sovereign as punishment for some offense." *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). As a result, only those forfeitures that "may be characterized, at least in part, as punitive will . . . be considered a fine for purposes of the [Eighth Amendment]." *von Hofe v. United States*, 492 F.3d 175, 182 (2d Cir.2007), citing *Austin v. United States*, 509 U.S. 602, 621–22, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993).

In *Platter of Gold*, we determined that a civil forfeiture action brought pursuant to 18 U.S.C. § 545 was remedial rather than punitive. *See* 184 F.3d at 139–40. Two factors were central to our determination. First, the forfeiture "was not part of a criminal prosecution," but was rather "a civil in rem proceeding." *Id.* at 139–40. Second, and "[e]ven more important," the forfeiture proceeding was brought under "a customs law," which are "traditionally viewed as non-punitive." *Id.* at 140. As a result, the forfeiture was remedial and therefore "outside the scope of the Excessive Fines Clause." *Id.*

Those same factors apply with equal force in this case. As in *Platter of Gold*, the statutory authority to seize and forfeit *Le Marché* came from a customs statute, *see* 19 U.S.C. § 1595a, which weighs strongly in favor of characterizing the forfeiture as remedial. *See Platter of Gold*, 184 F.3d at 140. Furthermore, the government's customs claim is unconnected to any criminal prosecution, and Davis's cul-

fact forfeitable"); *United States v. 863 Iranian Carpets*, 981 F.Supp. 746, 747–48 (N.D.N.Y. 1997) (same).

pability is irrelevant to its resolution. *Cf. Austin,* 509 U.S. at 619, 621–22, 113 S.Ct. 2801 (contrasting "traditional forfeiture statutes," with drug-related forfeiture statutes that "expressly provide an 'innocent owner' defense" and are punitive because they focus "on the culpability of the owner"). We therefore easily conclude that *Le Marché's* forfeiture was remedial, not punitive. *Cf. One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 237, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972) (noting that the forfeiture remedy provided under 19 U.S.C. § 1497—another provision of the Tariff Act of 1930—is a "remedial rather than punitive" remedy). As a result, Davis's claim under the Excessive Fines Clause must fail.

### B. *The Takings Clause*

■ Davis is also not entitled to compensation under the Takings Clause. Although the Fifth Amendment states that no "private property [shall] be taken for public use, without just compensation," U.S. Const. amend. V, the Supreme Court has made clear that "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain," *Bennis,* 516 U.S. at 452, 116 S.Ct. 994, citing *United States v. Fuller,* 409 U.S. 488, 492, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). As a result, "it has long been settled that if the government acts pursuant to a forfeiture statute, it may seize personal property without compensating the owner." *Redford v. U.S. Dep't of Treas.,* 691 F.2d 471, 473 (10th Cir.1982). In this case, the United States acted pursuant to the forfeiture provisions of 19 U.S.C. § 1595a, and was therefore entitled to seize *Le Marché* without compensating Davis.

### IV. *Attorney's Fees Under 28 U.S.C. § 2465(b)(1)(A)*

■ "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). However, CAFRA authorizes the courts to provide fees and other costs to claimants who "substantially prevail[ ]" in a "civil proceeding to forfeit property." 28 U.S.C. § 2465(b)(1)(A). Davis argues that the district court erred in denying her attorney's fees under that provision. According to Davis, her success in defeating the government's two forfeiture claims brought pursuant to 18 U.S.C. § 981(a)(1) makes her a prevailing party, even though the government ultimately succeeded in its forfeiture action.

This Court has not yet addressed the meaning of "substantially prevails" in the context of 28 U.S.C. § 2465(b)(1)(A). We have, however, suggested that our interpretation of Section 2465 should be informed by the case law applicable to similar fee-shifting provisions. *See United States v. Khan,* 497 F.3d 204, 209 n. 7 (2d Cir.2007); *Union of Needletrades, Indus. & Textile Employees v. INS,* 336 F.3d 200, 207 (2d Cir.2003). That case law makes clear that Davis did not "substantially prevail" under any reasonable interpretation of that phrase.

■ "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). In the case of Section 2465, Congress sought to address the "public outcry over the government's too-zealous pursuit of civil and

criminal forfeiture," without "expand[ing] government liability respecting legitimate seizures of property plausibly subject to forfeiture." *Khan*, 497 F.3d at 208. Congress balanced those competing priorities by limiting attorney's fees to litigants who "substantially prevail[ ]" in their attempts to retain possession of wrongfully seized property. *See* 28 U.S.C. § 2465(b)(1)(A). Given Congress's intent not to assume liability for "legitimate seizures," *Khan*, 497 F.3d at 208, we conclude that claimants who fail to retain ownership over any of the disputed property cannot collect attorney's fees under 28 U.S.C. § 2465(b)(1)(A), for in those cases the seizure was undoubtedly legitimate.

This conclusion is further supported by the Supreme Court's decision in *Sole v. Wyner*, which held that "a plaintiff who gains a preliminary injunction after an abbreviated hearing, but is denied a permanent injunction after a dispositive adjudication on the merits," is not entitled to an award of attorney's fees under the similar fee-shifting provision in 42 U.S.C. § 1988(b). *See* 551 U.S. 74, 77, 86, 127 S.Ct. 2188, 167 L.Ed.2d 1069 (2007). The Court reasoned that a party "who achieves a transient victory at the threshold of an action" is not entitled to attorney's fees "if, at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded." *Id.* at 78, 127 S.Ct. 2188.

We understand *Sole*'s focus on the litigation's ultimate outcome to require us first to identify the claimant's purpose for challenging the forfeiture, and then to determine whether the claimant achieved that purpose in some measurable way. In this case, the district court correctly concluded that Davis "litigated this action in order to obtain title to the artwork." *United States v. Painting Known as "Le Marché"*, No. 06 Civ. 12994, 2010 WL 2229159, at *1

(S.D.N.Y. May 25, 2010). Davis's partial victory at summary judgment merely narrowed the issues presented in this case. It did not entitle her to retain ownership of *Le Marché*. Instead, the forfeiture proceedings continued, and Davis was ultimately forced to relinquish possession of the monotype. Because Davis's purpose was to obtain title to *Le Marché*, not simply to elucidate the legal theories under which that title could and could not be defeated, and because the litigation resulted in that title vesting in the United States, Davis cannot be said to have obtained any of the relief that she sought. We therefore conclude that Davis did not "substantially prevail[ ]" within the meaning of 28 U.S.C. § 2465(b)(1)(A).

## CONCLUSION

We have considered all of Davis's remaining arguments on appeal and find them to be without merit. Accordingly, for the foregoing reasons, the district court's judgment of forfeiture and its order denying Davis attorney's fees are AFFIRMED.